IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Civil Action No.:   5:21-cv-00225

JUDITH KNECHTGES,  )
  )
   Plaintiff,  )
  )
 v.  )
  )
N.C. DEPARTMENT OF PUBLIC  )   **COMPLAINT**
SAFETY, ERIC HOOKS, in his individual  )   **(Jury Trial Demanded)**
and official capacity, JANET THOMAS, in  )
her individual and official capacity, and  )
TERRI CATLETT, in her individual and  )
official capacity,  )
  )
   Defendant.

# NATURE OF THE ACTION

1.      This is an action by Plaintiff Judith Knechtges ("Plaintiff" or "Knechtges")
under Title VII of the Civil Rights Act of 1964, as amended, (42 U.S.C. § 2000e et seq.)
("Title VII") to redress the denial of promotion based on sex discrimination against
Plaintiff by Defendants N.C. Department of Public Safety ("NCDPS" or "Defendant
NCDPS"), its Secretary Erik Hooks in his individual and official capacity ("Hooks" or
"Defendant Hooks"), Janet Thomas, in her individual and official capacity ("Thomas" or
"Defendant Thomas"), Terri Catlett ("Catlett" or "Defendant Catlett") in her individual
and official capacity, together collectively "Defendants."

2.      This is also an action by Plaintiff under the Age Discrimination in
Employment Act, as amended, (29 U.S.C. § 623 et seq) ("ADEA") to redress the denial

- 1 -

of promotion based on illegal age discrimination against Plaintiff by Defendant NCDPS and Defendants Hooks, Thomas, and Catlett in their official capacities.

3.      This is also an action by Plaintiff under Title VII and the ADEA against Defendant NCDPS and Defendants Hooks, Thomas, and Catlett in their official capacities to redress the retaliation and hostile work environment to which Plaintiff was subjected by Defendants after she complained about discrimination.

4.      This is also an action brought against Defendants Hooks, Thomas, and Catlett in their individual capacities under 42 U.S.C. § 1983 for violations of Plaintiff's rights to equal protection and to free expression under the U.S. Constitution and for damages resulting from those violations and against Defendants Hooks, Thomas, and Catlett in their official capacities for prospective injunctive relief.

5.      This is also an action under State law, *Corum v. University of North Carolina*, 389 S.E.2d 596, 97 N.C. App. 527 (1992) for violations of Plaintiff's rights to equal protection and free expression under the N.C. Constitution against NCDPS and Defendants Hooks, Thomas, and Catlett in their official capacities.

## PARTIES, JURISDICTION AND VENUE

6.      Plaintiff was employed by Defendant NCDPS at the time of the acts alleged in this Complaint and lives in Wake County, North Carolina.

7.      Defendant NCDPS is an agency of the State of North Carolina and operates the Central Prison Health Care Complex and at all relevant times Defendant NCDPS has been an employer as defined by 29 U.S.C. § 630 and 42 U.S.C. § 2000e.

8.      Defendant Erik Hooks has been the Secretary of the Defendant NCDPS at

- 2 -

all time relevant to the actions alleged in Plaintiff's Complaint.

9. Defendant Janet Thomas has been the DPS Pharmacy Director since Plaintiff became a full-time employee with the Defendant NCDPS.

10. Defendant Terri Catlett was employed as the Deputy Director of Health Services during the time relevant to the actions alleged in the Complaint.

11. This Court has jurisdiction over Plaintiff's Title VII and ADEA claims under 28 U.S.C. §§ 1331 because they raise an issue of federal law and over Plaintiff's State law claims under over Plaintiff's state law claims under 28 U.S.C. § 1367 (supplemental jurisdiction).

12. The acts which are the subject of this action and alleged to be unlawful were committed in the Eastern District of North Carolina.

13. Plaintiff was issued right to sue letters dated February 16, 2021, and this Complaint alleging that the Defendant violated Plaintiff's rights to be free from discrimination under Title VII and the ADEA is filed within less than 90 days from that date.

## STATEMENT OF FACTS

14. Plaintiff was hired as a contract pharmacist by Defendant NCDPS from December 2003 to January 2009. From January 2009 to January 2010, Plaintiff began a full-time position as a pharmacist. From January 2010 to April 2016 worked in one of the three Pharmacy Director positions.

15. Plaintiff is a 1978 graduate of Ohio Northern University, Raabe College of Pharmacy, with a Bachelor of Science in Pharmacy, a five-year course of study. In May

- 3 -

1981, Plaintiff was earned a Master of Business Administration (MBA) from Ohio University, Fisher College of Business, with a minor in Human Resources. In December 1981, Plaintiff was awarded a Master of Healthcare Administration (MHA) from Ohio State University, College of Public Health, majoring in Health Services Management and Policy with a minor in Finance.

16. Defendant's Central Pharmacy, located in Apex, North Carolina, is the main site for pharmacy services for all prisons operated by the State of North Carolina. Central Pharmacy provides direct pharmacy care for approximately 37,000 inmates and dispenses approximately 5,000 prescriptions per day and support and oversight to the two prisons at which pharmacies are located.

17. Defendant NCDPS operates pharmacies at the Central Prison Healthcare Complex (CPHC) Facility in Raleigh, North Carolina (Central Prison Pharmacy), and at the N.C. Correctional Institute for Women in Raleigh, North Carolina (NCCIW or Women's Prison Pharmacy).

18. In January 2010, Plaintiff became the Pharmacy Director at Central Pharmacy for Defendant. From January 2010 through April 2016, Plaintiff served as a Pharmacy Director with a working title of Pharmacy Manager for statewide pharmaceutical services for over fifty-five facilities, which included the pharmacies located at both Central Prison and Women's Prison and at the Central Pharmacy in Apex, supervising three (3) employees directly and sixty (60) employees indirectly.

19. As the statewide DPS Pharmacy Director, Thomas was the final individual responsible for all pharmacy services provided by the Apex Central Pharmacy, and on-

site pharmacies at Central Prison and Women's Prison. N.C. Correctional Institution for Women (NCCIW).

20.    As the head of all pharmacy services for Defendant NCDPS, Defendant Thomas also served as the Pharmacy Manager for the Central Pharmacy, as required by the NC Board of Pharmacy; and was responsible for:

- Meeting the overall pharmacy services goals of NCDPS;

- Ensuring that all NCDPS inmate patient needs were met;

- Ensuring compliance with laws, rules and regulations mandated by the Drug Enforcement Administration (DEA), the NC Department of Health and Human Services (NCDHHS), NC Board of Pharmacy (NCBOP) and all other applicable State and federal laws, rules, and regulations.

- Ensuring inventory accountability to meet state auditor requirements;

- Implementing and supervising programs to prevent medication waste and errors;

- Ensuring the timely delivery of medications;

- Protecting funds appropriated to NCDPS from mismanagement and misuse;

- Ensuring that statewide pharmacy services met community standards, DPS goals, patient needs, DEA, DHHS and State/Federal laws, rules, and regulations; and

- Providing oversight of performance management, staff development, human resources, personal services contracts, and the hiring process for

- 5 -

position in pharmacy services.

21.     Plaintiff worked in a variety of pharmacy roles with Defendant Thomas her entire tenure with DPS Pharmacy Services. As one of the three Pharmacy Director positions, Plaintiff worked very closely with Defendant Thomas and Debra Fitzgerald (Assistant Pharmacy Director to Defendant Thomas) starting in January 2010.

22.     Upon Plaintiff's promotion in January 2010 to the Pharmacy Director role and as Manager of Pharmacy Services, Plaintiff and Thomas became close friends and spent much time together including but not limited to daily work meetings, going to lunch on a daily basis, regular texting, daily discussions of personal and family concerns. Plaintiff and Defendant Thomas also shared a room for a wedding of a mutual friend, confided with each other about intimate personal relationships, and went to after-work functions such as plays.

23.     Terri Catlett, as the Deputy Director of Health Services, was responsible for improving the health status of the offender, obtaining the highest value for total tax dollars spent, providing care that positively impacted the public health sector, ensuring healthcare practices that met an acceptable standard of care, and ensuring that correctional facilities operated by NCDPS were treated and viewed as public health stations that significantly impacted the health status of the larger community.

24.     The following statewide DPS statewide positions reported to Catlett: Medical Director; Director of Psychiatry; Director of Nursing; Dental Director; Director of Behavioral Health; Business Officer; Director of Informatics and Risk Manager. In

- 6 -

2016, Catlett reported to the DPS Director of Prisons, George Solomon and after Solomon left in 2017, to Kenneth Lassiter who replaced Solomon.

## MISSING CONTROLLED SUBSTANCES AT CPHC

25.     In 2015, Plaintiff discovered numerous anomalies at CPHC pertaining to lack of controlled substances accountability. This discovery occurred around the time that Defendant was in the process of implementing a new electronic healthcare record (EHR) system at CPHC. As was later discovered by the Plaintiff, there was insufficient oversight and a lack of quality-assurance processes in place with the nursing staff at CPHC to promptly discover the lack of controlled substance medication administration documentation or to adequately address them, resulting in lack of accountability for hundreds of doses of controlled substances, thereby creating an environment ripe for criminal diversion.

26.     Due to reports that had to be filed by NCDPS and Central Pharmacy with the DEA and N.C. Board of Pharmacy (BOP), red flags were raised initially resulting in an internal NCDPS investigation, but ultimately resulting in both DEA and NCBOP investigations.

27.     When Plaintiff learned of these issues and the inquiries made by governmental agencies, Plaintiff reported these issues to management officials involved in the supervision of health services. At some point, the then CEO of CPHC resigned his position.

- 7 -

28.     In addition to the DEA investigation, the NCBOP also conducted an investigation of the missing controlled substances. Ultimately, the United States Attorney's Office became involved. Upon information and believe, Defendant NCDPS was found at fault and paid a substantial fines of $250,000 as a result of the investigation.

29.     Upon information and belief, Defendant Catlett, Deputy Director of Health Services Administration, received disciplinary action (Written Warning) for her failure to address the problem.  Dr. Olushola Metiko, CPHC Medical Director, told Plaintiff that Defendant Catlett held Plaintiff responsible for the fact that Catlett was issued a Written Warning.

## PLAINTIFF'S APPOINTMENT AS INTERIM CEO

30.     During the DPS internal and DEA external investigation into the missing controlled substances, Plaintiff was asked by David Guice, Chief Deputy Secretary over prisons and juvenile justice, to take the position as Interim CEO for CPHC, given her understanding of NCDPS healthcare management, NCDPS prison healthcare, and controlled substance accountability. During the investigation, Plaintiff was called upon to help identify solutions to the problem because of her experience implementing the Omnicell system, which was believed to have made the documentation issues more obvious.  On April 22, 2016, Plaintiff was appointed as the Interim CEO.

31.     The CEO position is the highest-ranking Health-Services position at Central Prison and is responsible for the directing CPHC's day-to-day operation and staff and the administration of the hospital.  In this position, Plaintiff worked directly

- 8 -

with Guice's Deputy Secretary for administration Joseph Prater III who supervised Health Services for prisons and juvenile justice.

32.     CPHC housed a Regional Medical Center providing inpatient and outpatient services, including emergency, urgent, acute, infirmary and chronic levels of healthcare, preventive medicine, and rehabilitative healthcare. The Mental Health Facility accepted inmates with acute and chronic mental health illnesses.

33.     Plaintiff's CEO duties included oversight of every function at CPHC related to the inpatient and outpatient case:  fiscal, accounting, human resources and administration, clinical staff, medical clinics, the OR, radiology services, dental services, lab services, medical and psychiatric care, dialysis, pharmacy services, the medical warehouse, and medical records and the delivery of services to a large outpatient population sent to CPHC from other prisons.

34.     As CEO, Plaintiff oversaw approximately 570 employees within the 325-bed facility which included a 120-bed medical facility, 216-bed mental health facility, and a large outpatient component. Plaintiff was responsible for ensuring high quality inmate care, treatment, and services, maintaining a reasonable cost structure, and ensuring compliance with State and federal laws and regulations and standards set by accrediting bodies.

35.     Plaintiff was also responsible for ensuring that the controlled substances issues that had arisen during the investigation were corrected.  Plaintiff was required to work with both Defendant Thomas, her previous supervisor, and Terri Catlett, both of whom, it was believed by some, had failed to take sufficient action to address the

issues with the missing controlled substances and whose nonfeasance had placed the agency in serious jeopardy with the NCBOP and the DEA.

36.     In addition, when Plaintiff became the Interim CEO, Plaintiff was told that her pharmacy duties and responsibilities would go to Defendant Thomas, and her assistant director Deborah Fitzgerald because it would be impossible for Plaintiff to continue to perform both her pharmacy duties and the CEO duties. Thomas and Fitzgerald greatly resented this assignment of additional duties to them and blamed Plaintiff.

## RESENTMENT AND HOSTILITY RELATED TO PLAINTIFF'S APPOINTMENT AS CEO

37.     Both Thomas and Catlett were not happy with Plaintiff's new role as interim CEO, and resented her for being placed in a position as their peer and with authority equal to or greater that their own authority and resented her for helping identify solutions to the missing controlled substances problem that they had been unable to resolve.    They also resented the additional work they were required to perform as a result of Plaintiff's interim appointment.

38.     Plaintiff had been was told during the DPS internal investigation that Catlett had told one of the investigators, Theodis Beck, previous DPS Deputy Secretary, that Plaintiff was going around bragging that Plaintiff was going to fix all the controlled substance problems at CPHC. When Beck told Plaintiff that Catlett had made this remark, Plaintiff denied to Beck that she had made any such remark. Plaintiff further explained that she would not have made such a remark because she knew that it would

be impossible for Plaintiff to "fix" the problem because she did not manage the nursing staff at the facility; nursing staff and their documentation or lack thereof was the issue with the missing controlled substances. Beck agreed with Plaintiff.

39.    The hostility from Thomas and Fitzgerald increased to such an extent between April 2016 and the fall of 2016, that beginning in October 2016, Ms. Thomas and Ms. Fitzgerald refused to come regularly to CPHC to ensure the success of the Interim Pharmacy Supervisor, Ginger Lockamy, a clinical pharmacist, who had volunteered to provide oversight for CPHC pharmacy as the designated Pharmacy Manger as required by NCBOP rules. All pharmacies under the North Carolina Board of Pharmacy rules and regulations are required to have a designated Pharmacy Manager. Eventually, Lockamy felt overwhelmed because of the lack of assistance and hostility from Thomas and left NCDPS.

40.    More significantly, Defendant Thomas and Fitzgerald resented CP's tenure as interim CEO to such an extent that they both refused to come to CPHC during the DEA and NCBOP's controlled substance investigation which occurred in November 2016. CP was so concerned about the lack of participation by Thomas, who was the NCDPS State Pharmacy Director and Fitzgerald, who was the Assistant NCDPS State Pharmacy Director, that she asked George Solomon, Director of Prisons at the time, to whom Thomas and Fitzgerald reported, to direct them to attend the visit by the DEA and NCBOP to ensure no greater liability occurred for DPS.

41.    Both Thomas and Fitzgerald were very angry and told Plaintiff that they did not have any oversight over the CPHC pharmacy because there was no dotted line

to them in BEACON, the State IT system housing the lines of supervision and organization. CP responded them that there might not be a dotted line of indirect supervision over the CPHC pharmacy in BEACON, but their statewide pharmacy oversight responsibilities still extended to supervision of the CPHC pharmacy. Plaintiff told them that she did not have direct supervision of every single CPHC staff in BEACON, but she was still responsible for all 550 employees.

42. Plaintiff learned that after she became interim CEO, Defendants Catlett and Thomas worked relentlessly to undermine Plaintiff's position as CEO and to sabotage her ability to manage the facility.

43. There were many examples of this hostility. At the beginning of her During Plaintiff's tenure as interim CEO, while in a meeting with Warden Thomas and Catlett, Catlett stated that she would meet with Plaintiff every two weeks. However, Catlett did not ever come never came to Plaintiff's office to meet with her. When Catlett did come to CPHC for meetings with other individuals, Catlett never let Plaintiff know she was there and did not come by Plaintiff's office.

44. When Catlett's promises to meet with Plaintiff turned out to be untrue, Plaintiff then sought to meet with Ms. Catlett at Catlett's office in the Shore Building since Catlett had clinical dual oversight of the facility. When Plaintiff went to her office on several occasions attempting to establish a rapport with Ms. Catlett and discuss CPHC issues of mutual concern, Ms. Catlett was so unwelcoming that Plaintiff did not return.

- 12 -

45.     Catlett and Plaintiff had discussed the lack of cleanliness that Plaintiff encountered upon her arrival as interim CEO.  Catlett was aware that Plaintiff had initiated processes to improve the cleanliness, such as developing inspection checklists, placing new wheels on food carts, having a new more durable floor product developed by Correction Enterprise, rotating staff assignments and the purchase of additional terminal cleaning machines. Plaintiff then learned that when Catlett came to CPHC, she made disparaging comments about the job Plaintiff was doing, i.e., such as making negative comments about the cleanliness of the facility when, in fact, she knew that Plaintiff had corrected past conditions.

46.     In addition, on one occasion, Director of Prisons, George Solomon, told Plaintiff that Plaintiff needed to respond to Terri Catlett's emails because Defendant Catlett had complained to Director Solomon that Plaintiff did not respond to her emails. Plaintiff told Director Solomon that she always responded to Catlett's emails.  Plaintiff then documented the emails from Defendant Catlett to Plaintiff, and Plaintiff's responses to Defendant Catlett, and provided them to Director Solomon to show him that Plaintiff did in fact respond to every email sent by Catlett.

47.     In addition, in meetings at CPHC with Warden Thomas and outside constituents, Ms. Catlett would regularly ignore Plaintiff's presence as the Interim CEO in front of CPHC employees and other NCDPS employees and ask Warden Thomas to begin the meeting  even though the meetings in CPHC and not Central Prison.  If the meeting were taking place at the CPHC, Warden Thomas always deferred to Plaintiff as the CEO and acknowledged Plaintiff's role and asked her to lead the meeting.

- 13 -

48.     After particularly denigrating behavior towards Plaintiff at one of the meetings, Plaintiff remarked to Warden Thomas and Stephen Waddell (Associate Warden), that she assumed that Catlett acted like this with other people, also. Warden Thomas said, no, she only acts like that with you.

49.     Brent Soucier (Unit Manager), Joy Jones (Director of Nursing), and Robey Lee (Interim Regional Director),  all  noticed Catlett's demeaning and unprofessional behavior towards Plaintiff in meetings and interactions and remarked on it to Plaintiff. On many occasions, Plaintiff observed that Ms. Catlett would treat other males employees acting in interim capacities with deference, very differently from the way Catlett treated Plaintiff while she was interim CEO.

50.     As stated above, Defendant Thomas' behavior towards Plaintiff changed drastically upon Plaintiff's selection as the Interim CEO. Thomas seldom came to CPHC though she was ultimately responsible for the pharmacy services at the facility (much like Catlett). When Thomas did come to facility, i.e., a retirement or Performance Evaluation Division visit, Thomas would give Plaintiff such an obvious "silent treatment," that others remarked on it. For example, while at a retirement party, when Plaintiff sat down next to a group of pharmacy staff, Thomas immediately got up and left. In addition, when Defendant Thomas and Fitzgerald came to CPHC they never came by the Plaintiff's office even to check on the status of the very serious pharmacy investigation.

51.     Defendants Catlett, Defendant Thomas, and Fitzgerald all resented Plaintiff because she was able to institute corrective actions  with regard to the lack of

documentation for the controlled substances losses successfully within two weeks of starting in the CEO position, a subject that had occupied everyone for so long prior to Plaintiff's becoming interim CEO. Procedures and accountability measures implemented by Plaintiff and nursing management resulted in many Employee Action Plans (EAP) and Written Warnings (WW) to nursing staff which should have occurred under the previous CEO and Ms. Catlett, as the Director of Health Services for NCDPS.

52.    After Plaintiff became CEO, Thomas seemed to resent Plaintiff because Plaintiff had risen above her in the NCDPS organization, was being paid more than her and was receiving many accolades regarding Plaintiff's performance. Just prior to starting at Central Prison Healthcare Complex in April 2016, Thomas asked Plaintiff how much Plaintiff was being paid. At that time, Plaintiff did not know and told her so. She angrily said Plaintiff would never get more than 10%, to which Plaintiff responded that that it was not a problem and that the Plaintiff looked forward to providing healthcare oversight for CPHC and correcting the controlled substance problems. working on the  controlled substance problems.

53.    Sometime into her tenure as interim CEO, Plaintiff learned that Thomas was telling many people how much Plaintiff had changed after Plaintiff was in the CEO position.  Plaintiff ran into a pharmacist at the supermarket who told Plaintiff that Thomas was telling staff that Plaintiff had changed and that Plaintiff had done many things that she did not know about (when they were formerly good friends).

54.    When the decision to post the CEO position for permanent hire occurred, Plaintiff learned that Thomas was engaged in an active campaign opposing Plaintiff's

selection as the CEO. For example, Plaintiff was told that Defendant Thomas was spreading false rumors within NCDPS management, making statements to the effect of Plaintiff has changed since she became CEO; Plaintiff is not capable of serving as CEO; Plaintiff bought a house because she wants the CEO job; Plaintiff's hand gestures are aggressive.

55. Plaintiff learned that Thomas spoke negatively about Plaintiff and disparaged her to Olushola Metiko M.D. (CPHC Medical Director) and Paula Smith, M.D. (retired DPS Medical Director). Dr. Metiko told Plaintiff that if he told Plaintiff the things which had been said about her, Plaintiff would not be able to sleep at night. In addition, Plaintiff learned that Paula Smith, MD, had spoken negatively about Plaintiff in Smith's exit interview which had a negative impact on Plaintiff's ability to get the CEO position. However, Plaintiff had never worked with Dr. Smith, so Dr. Smith must have received negative information from either Defendant Thomas or Defendant Catlett, with whom she had worked in the Shore Building.

56. Plaintiff also met with Kenneth Lassiter and Reuben Young to express Plaintiff's concerns because Plaintiff had been told their negative comments were affecting Plaintiff's ability to get the CEO position. When Plaintiff expressed Plaintiff's concerns to Mr. Lassiter about the disparaging and untrue gossip and rumors from Terri Catlett and Thomas, he said he knew they spoke half-truths and poor Terri had almost lost her job over the controlled substance problem.

## PLAINTIFF'S SUCESSES AS INTERIM CEO

57.     By all accounts, Plaintiff excelled as the Interim CPHC CEO.    Her evaluations while working as interim CEO all ranked her as "exceeds expectations," the highest rating possible. In addition, in her position as CEO, Plaintiff uncovered multiple instances of gross mismanagement, unacceptable patient/inmate standards of care and significant waste of money at CPHCF which she attempted to correct.

58.     As the Interim CEO, Plaintiff initiated a detailed assessment of CPHC pharmacy and nursing practices. Within the first month as Interim CEO, Plaintiff corrected the controlled substance problems through numerous system changes and improvements which included monitoring, reporting and compliance requirements.

59.     In June 2016, Plaintiff was asked by George Solomon, Director of Prisons, to correct accounts payable and fixed asset Compliance Audit deficiencies and concerns which had been outstanding since the first CPHC audit in 2014.

60.     Implementing corrective action was a massive task due to the longstanding, unaddressed problems. For example, the facility had never done quarterly laptop inventories since opening in 2011 with the first completed in September 2016. Also, over $6 million dollars in retired encumbrances were resolved and closed. Corrections to fixed asset inventory requirements involving such items as missing assets, junk, surplus and transfer were developed and resolved.

61.     For example, $212,335.17 in 78 duplicated automated dispensing cabinets outstanding since 2014 were identified and retired.  Plaintiff was asked to review 2013, 2014 and 2015 year-end inventory results which were corrected, and new guidelines and expectations were initiated. Since CPHC had opened in 2011, state resources related to

- 17 -

the healthcare complex had been misused, misappropriated and it appeared to Plaintiff that policies in place had been simply ignored. Neither CPHC nor Prison leadership had been held responsible or expected to correct the serious deficiencies.

62.   Plaintiff corrected or attempted   to correct serious CPHC gross mismanagement involving areas such as dental services, lab services, audits, rental vs purchase of equipment, preventive maintenance, AED's (automated external defibrillators), blood product services, pharmacy services, attendance, patient identifies, internet access, staff badges, death reports, GE/Olympus equipment contracts, lack of competitive bidding and lack of adequate staff resources for which Defendant Catlett had some responsibility.

63.   Plaintiff discovered a gross waste of money in the CPHC Dental Clinic involving the contract oral surgeon, Dr. W., who required the other dentists to act as his scribe, enter patient data into the electronic health records, and obtain prescription drugs from the pharmacy as needed for patients when he came to CPHC to perform oral surgery.  CPHC dental clinic was composed of three dentists  with an average salary of $150,000; six dental assistants, with an average salary of $40,000; and one dental hygienist, with an average salary of $50,000.  The dental clinic had a total cost of approximately $740,000 a year.

64.   Plaintiff learned that on oral surgery Wednesdays, all dental staff would stop all inmate dental care to comply with Dr. W's demands for support with the result being a significant negative effect on the quantity of patient dental care and lack of

dental service efficiencies. This practice is not in line with community standards. However, over the years, Dr. W's practice had become the custom in the facility.

65. Nonetheless, when Plaintiff proposed to change the arrangement so that oral surgery was provided in a different manner which did not require the dental clinic to shut down when Dr. W. came, Defendant Catlett became angry at Plaintiff for raising the issue and refused to make any changes.

66. Plaintiff also learned that expensive hospital equipment had never undergone any preventive maintenance since purchase. The biomedical department at CPHC is responsible for ensuring that all equipment is properly maintained and repaired. The biomedical department reported to Plaintiff that there was no documentation to show that 705 pieces of hospital equipment had ever received preventive maintenance as far back for some pieces as 2011 when CPHC first opened.

67. This lack of maintenance creating a significant risk of liability to the State due to the danger of equipment malfunction causing harm to inmate patients and health care staff. The lack of maintenance included critical equipment such as vital sign machines, defibrillators, e-pumps (enteral pumps), oxygen concentrators, EKG machines, IV pumps, hospital beds, etc. Because the biomedical staff at CPHC was only two individuals, when both quit due to a lack of support from Health Services and the liabilities they feared, CPHC was left without any biomedical department staff for months, even though Plaintiff made repeated requests to Defendant Catlett that the positions be filled.

- 19 -

68.     Plaintiff also learned that CPHC's contract payments for pathology services were also grossly overpaid as far back as at least 2014. The physician who provided these services on a part-time basis (25 hours/week), had been paid as much as $30,500/month and over $234,000 a year. Plaintiff learned that she could obtain ample outside pathology contract services in line with community practices for 4 to 5 hours a week and with an average cost of between $2,500 - 5,000 a month (or $30,000 – 60,000 a year), with a potential savings of almost $2 million/year from 2014 to 2020. Again, Plaintiff made these cost-saving recommendations to Defendant Catlett who refused to change the contract for pathology services even thought NCDPS was contracting for unnecessary services and paying an exorbitant amount for them.

69.     Prior to Plaintiff's time as interim CEO, healthcare management did not ensure the 40 CPHC AED's (automated external defibrillators) in medical, mental health and Central Prison outside rounds) were being checked monthly, potentially resulting in loss of life due to the inability to respond to cardiac arrest. The NCDPS AED program provided that AED's were to be checked monthly. In June 2017, Plaintiff was informed by a Biomed technician that there was no documentation that the AED's had been checked since prior to June 2017. Upon a walk around with the Biomed technician, Plaintiff discovered that the batteries for all 40 AED's expired in June 2017. Plaintiff informed Defendant Catlett who then attempted to blame Plaintiff and her staff, but eventually lacked the documentation to prove her accusations.

70.     At one point during her time as interim CEO, Plaintiff learned that Health Services under Defendant Catlett's supervision had failed to renew the Rex Hospital

- 20 -

Blood Service contract for CPHC.  When CPHC tried to order blood for the facility, they found that Rex would not send any more blood to the hospital because the contract was not renewed.  Rex explained that when the contract was ending, they attempted to call Defendant Catlett but she did not return their calls. As a result, CPHC was required to send inmates who needed blood out of the facility at additional cost and with additional risk.  Sending an inmate outside the facility required one or two officers depending on the inmate's security level.

71.    Health Services was very aware that the transportation of inmates to outside appointments was already a serious financial and safety problem at CPHC due to extremely short-staffing of correctional officers. In addition to the added cost, sending an inmate into the community poses an increased danger to public health and safety. At a meeting in October 2018, Plaintiff told one of the DPS lawyers that Defendant Catlett had told Plaintiff that the blood contract was still "with Legal."  The NCDPS lawyer then told Plaintiff that it had been approved for some time, that Defendant Catlett knew that, and that the contract should have been forwarded to Purchasing to get the contract back in place.  Dr. Metiko (previous CPHC Medical Director), informed Plaintiff that as of January 2020, CPHC facility still did not have an outside blood service contract.

72.    Plaintiff also learned as interim CEO that decisions regarding pharmacy staffing had resulting in excessive expenditures on pharmacy services due to overstaffing.  The North Carolina Board of Pharmacy generally recommends that a pharmacist be allowed to supervise two pharmacy technicians. When Plaintiff arrived at CPHCF, this ratio was completely askew, as there were approximately 43

- 21 -

pharmacists and only 21 pharmacy technicians. A pharmacist's salary within the Department of Public Safety is approximately $100,000, while a pharmacy technician makes around $40,000.

73.     Plaintiff proposed reducing the number of pharmacists and increasing the number of pharmacy technicians to bring the ratio in line with best practices recommended by the North Carolina Board of Pharmacy. Changing that ratio could save the State of North Carolina between $1,400,000 and $2,000,000 over a four-year period. However, when Plaintiff suggested changing the staffing ratios to Defendant Thomas, she rejected the idea.

74.     As interim CEO, Plaintiff learned that the average price of renting the Clinitron beds and Dolphin mattresses (required medical equipment) was approximately $17,000 - 19,000 a month. Plaintiff initiated research on purchasing the items, instead of renting them, and beginning in February 2018, the cost-savings from purchasing the equipment instead of renting it was over $250,000 a year, with a four-year savings of $1 million.

75.     Plaintiff also learned that lack of attendance by healthcare staff was a serious issue and was impacting patient care especially given that CPHC was already short-staffed. Plaintiff was informed that staff were not coming in on time and not staying a full day. Plaintiff developed the first CPHC attendance policy in June 2016 and weekend callouts decreased by over 75%. The NCDPS HR Deputy Director had numerous discussions with Plaintiff about the importance of applying the same standards to providers such as physicians as were applied to nursing and administrative

staff. NCDPS lawyers told Plaintiff that Health Services (under Defendant Catlett) had been told they could rely on gate log swipes in and out to document attendance, so Plaintiff implemented a policy requiring all staff, including physicians, physician's assistants, and nurse practitioners, to be subject to the attendance policy verified by gate log entries.

76. When this policy was implemented, Plaintiff received numerous negative comments and pushback from Defendant Catlett, Paula Smith, MD, and Anita Wilson, MD, regarding holding the providers (MD, NP, PA) accountable like the rest of the staff. The policy change by Plaintiff was implemented in part to reduce overtime paid to staff required to holdover due to late or absent employees, But it was also due to a directive from the NC Office of the State Auditor, after an audit into the overpayment due to an absence of time records by a contract physician who was overpaid over $500,0000. NCDPS employees who opposed Plaintiff's policy change were aware of the audit's finding and directive, yet still criticized Plaintiff.

77. Miscellaneous issues was also identified and corrected by Plaintiff during her tenure, some of which were very unpopular:

- **Patient Identifiers**: Plaintiff was informed that two patient identifiers were not being used by healthcare staff as required by policy. A minimum of two patient identifiers are required by Joint Commission and are a standard pf practice in the community to ensure patient

safety. Processes were put in place to monitor the use of two patient identifiers.

- **Internet Access**: On the request of the Director of Nursing, Joy Jones, Plaintiff placed nursing and a few other areas on restricted internet access due to misuse of the internet, particularly during the night shift. The concern was that it was affecting the staff's ability to provide adequate care., e.g., some were watching movies or worked on outside classwork.

- **Staff Badges**: NCGS 90-640 states that healthcare practitioners shall wear a readily visible badge. CPHC required the first name initial, last name and title on staff badges. All staff were required to wear badges that identified their role in the healthcare facility which helped ensured patient and staff safety.

- **Appearance and Grooming**: It was brought to Plaintiff's attention that staff were not dressed appropriately and according to policy. Common problems were inappropriately styled clothing (short skirts/dresses, stiletto heels, revealing clothing, colored hair, hats, long nails by direct care nursing staff etc.

- **Death Reports**: In May 2016, Plaintiff was informed by Linda Jordan (deceased), CPHC Risk Manager, that CPHC was months behind on filing 40 death reports and they had not been completed for months; policy required completion within 14 days.

- 24 -

- **GE/Olympus Contracts**: In June 2016, Ann Harper, Central Prison Accounting Clerk, paid Olympus $43,376.84 for overdue invoices, which should have been paid during the previous CEO's tenure. Olympus was ready to cancel the CPHC contract. Over 90% of the overdue invoices were from 2015. Ms. Harper took responsibility for the invoices since they were critical to the OR and Radiology services, even thought it was not her fault the invoices had not been paid.

- **Competitive bidding on operating room products**: Plaintiff learned that a manufacturer's representative was the sole source supplier for expensive OR items requested by UNC surgeons. State auditors directed the facility to ensure that single source purchases for had the appropriate documentation and that high-cost items were bought through competitive bidding. A change from sole sourcing to competitive bidding resulted in a yearly savings of approximately $300,000.

78. Plaintiff corrected all of the gross mismanagement and waste of money she could and reported it to her supervisors, Central Prison Warden Edward Thomas and Defendant Catlett. In addition, Plaintiff shared the information with staff at monthly Health Services leadership meetings. She also shared the information with Prisons leadership staff including Kenneth Lassiter (Director of Prisons), Paula Smith (DPS Medical Director, Defendant Thomas, Anita Myers (Director of Nursing), Defendant

Catlett (Director of Health Services), James Clare (DPS Dental Director), Donna Woodruff (DPS Assistant Dental Director). Later, after the administration changed, some of this information was also shared with DPS Secretary Hooks and interim Deputy Secretary Young.

79. Plaintiff could tell that her raising of these issues made her unpopular even though they were issues of public concern that NCDPS should have wanted to correct in order to save the State money and provide constitutionally adequate care to the inmates in NCDPS custody.

## CHANGES IN ADMINISTRATION / DECISION TO FILL POSITION PERMANENTLY

80. In November 2016, Roy Cooper was elected to replace Pat McCrory as Governor of the State. In January 2017, Cooper was sworn in and soon thereafter Erik Hooks was appointed to be the new Secretary of NCDPS.

81. In April 2017, Defendant posted the Hospital CEO position intending to fill it on a permanent basis. Upon information and belief, Defendants Thomas and Catlett were vocal in their opposition to Plaintiff's continuing in the position because they disliked her being in a position of power comparable to their own because of her gender and age, and they urged the new Secretary and newly hired agency officials that she not be selected as permanent CEO and indicated that they could not continue to work with Plaintiff in that position.

82. After a period of transition, on May 1, 2017, George Solomon, the Director of the Division of Prisons, with whom Plaintiff had worked well while CEO, retired and

- 26 -

was replaced by Kenneth Lassiter, the deputy director of prisons. Plaintiff understood that Annie Harvey, area administrator for one of the four regions of prisons, had been Lassiter's only serious competition for the position of Director of the Division of Prisons. Effective July 1, 2017, Annie Harvey was appointed by David Guice to Lassiter's former position as Deputy Director of Prisons. Guice had continued to hold over during the new administration.

83.     Plaintiff applied for and was interviewed for the position by a very qualified and experienced interview panel consisting of: Joseph Prater, DPS Deputy Secretary of Administration (which oversaw Health Services); Annie Harvey, Deputy Director of the Division of Prisons (which oversaw Central Prisons); and Dr. Sara Peebles with the NC DHHS, who had expertise in overseeing the health care facilities and hospitals run by that agency.

84.     Following the first interview on September 17, 2017, Plaintiff was informed after a meeting on December 8, 2017, by Deputy Director Joseph Prater that Plaintiff was the interview panel had selected Plaintiff as the most qualified applicant for the CEO position and the he was recommending that Plaintiff be selected for the CEO position.

85.     On December 20, 2017, Reuben Young, former Superior Court judge, was appointed to serve as Chief Deputy Secretary over prisons and juvenile justice replacing David Guice. Guice had originally appointed Plaintiff to the interim CEO position.

86.     Shortly after Young's arrival, after Prater told Plaintiff on December 8 that she had been selected for a second time, Prater call Plaintiff and informed her that DPS

was going to repost the CEO position. Plaintiff was told at some point that the position was being re-posted because some candidates had been allowed to provide additional answers or had gotten more time to interview and because there had been a statewide reclassification of positions, including the CEO position.

87.     At the time, Plaintiff had no reason to question whether the reasons she was given for re-posting were actually true or even valid reasons for re-posting the position. However, Plaintiff knew as hiring official at NCDPS that it was not uncommon for some interviews to run shorter and some longer. In addition, upon information and belief, NCDPS filled other positions for which interviews had occurred around the same time as hers even though those positions were also subject to the statewide reclassification changes. The reasons for re-posting were pretextual.

88.      The second posting occurred on December 20, 2017. Plaintiff was told by Joseph Prater when he told her it was going to be reposted that she was not required to reapply or be interviewed for the second CEO posting as she was still a viable candidate for the job. Plaintiff told Prater that she would reapply because she had many other accomplishments since the first posting. However, Plaintiff was not scheduled for a second interview.

89.     The same interview panel which conducted interviews for the first posting candidates also conducted the second posting interviews. Once again, Joe Prater told Plaintiff she was the top contender among the applicants being considered for the second job posting. Subsequently, he told her that the selection panel had again selected Plaintiff for the job. Once again however, Plaintiff did not receive an offer letter.

- 28 -

90. Upon information and belief, based on what Plaintiff was told at some point, Defendants decided not to offer the position to Plaintiff but decided to offer the position to an outside candidate who declined the position.

91. Eventually, DPS management pushed Joseph Prater out of his position, in part, because he refused to compromise the candidate selection process and ensure Plaintiff was NOT selected to fill the CEO position on a permanent basis. After Mr. Prater's departure, in May 2018, Defendant posted the Central Prison Hospital CEO position a third time on August 7, 2018. Plaintiff was not told why the position was being posted for a third time.

92. The August 7, 2018 posting specifically directed all prior applicants to resubmit their materials. The third posting noted that this posting was a repost under the new State Classification and Compensation System, and that the CEO position was "Managerial Exempt" and is not subject to protection under Article I, Chapter 126, of the North Carolina Human Resources Act." (Pet. Ex. 1) The posting listed the following Minimum Education and Experience Requirements:

- Master's degree in Hospital Administration, Health Care Administration, or a clinical Human Resources field, AND six (6) years of hospital administrative experience; or

- Bachelor's degree in health care or business administration AND eight (8) years of hospital administrative experience; or

- An equivalent combination of education and experience.

93. The posting informed applicants of the "Knowledge, Skills and Abilities/Competencies," ("KSA") along with the minimum education and experience, required to be deemed "eligible" for the position. These KSAs included demonstrated knowledge of:

- healthcare delivery system, operations, and trends,

- state and federal standards, policies and regulations concerning healthcare administration,

- Joint Commission on Accreditation of Healthcare Organizations (JCAHO) certification standards, and

- business and management principles involved in strategic planning, resource, resource allocation, human resources, coordination of people and resources.

94. Plaintiff was unsure why the posting required Joint Commission on Accreditation of Healthcare Organizations (JCAHO) certification experience because Defendant Catlett had told Plaintiff that DPS Health Services had made a decision that NCDPS would not pursue JCAHO for CPHC or Women's Prison medical facilities and, instead, would see accreditation under the more appropriate standards promulgated by the American Correctional Association (ACA) for prison hospitals and medical facilities.

95. The CEO posting also listed Management Preference for those applicants who specified experience in:

- Previous executive-level experience at a correctional or involuntary custody behavioral or medical healthcare facility/institution.

- 30 -

- Demonstrated experience providing direction and working collaboratively with staff at all levels including physicians, nurses, technical, clerical service, maintenance, and other personnel.
- Proven ability to propose, monitor, analyze and adjust hospital budgets to achieve operational goals.
- Demonstrated experience with computerized record management systems used to store and process patient, and other related data.

96. On August 19, 2018, Plaintiff applied for CEO position a third time. Plaintiff was the incumbent in the position at the time it was posted and at that time had approximately 13 years of direct experience (6 as a part-time contractor and 10 as a full-time employee) working in the DPS healthcare system, most of which involved the complex oversight of a statewide healthcare system, not just one facility.

97. Reuben Young, as the interim Chief Deputy Secretary, selected the interview panel for the CEO position this time, which consisted of Dr. Anita Wilson-Merritt, who had replaced Paula Smith as the State Medical Director for the Division of Prisons; Annie Harvey, then Deputy Director of Operations for the Division of Prisons; and Doug Holbrook, Defendant's Chief Financial Officer. Dr. Wilson-Merritt served as the Chair of the interview panel.

98. Dr. Wilson-Merritt had opposed some of the changes that Plaintiff had made at CPHC and had also voiced opposition to Plaintiff's efforts to hold the physicians, nurse practitioners, and physician's assistants working at CPHC to the same attendance standards as the other CPHC staff. Mr. Holbrook worked on the 14th Floor of the

- 31 -

Archdale building with the other staff reporting to Defendant Hooks and interim Chief Deputy Secretary Young and upon information and belief, worked closely with them.

99.    Annie Harvey was the only member of the third interview panel who had also served on the prior interview panels which had selected Plaintiff as the most qualified applicant. Ms. Harvey had been elevated to the position of Deputy Director of Prisons by then Chief Deputy Secretary David Guice in July 2017. At the time of the third interviews, however, Guice had been replaced by Judge Young.

100.   The interview panel interviewed Plaintiff and four other candidates, two external and two internal, for the CEO Position. Upon information and belief, the interview panel did not rate Plaintiff as one of the top three candidates. In fact, Plaintiff and one other candidate received the lowest interview scores; in other words, the panel rated three other candidates higher than Plaintiff. Eventually, the Plaintiff learned that the interview panel had recommended Chad Lovett as the top candidate. Plaintiff was told later that Chad Lovett had also been in the second applicant pool, and had received a Below Average by the first interview team and Plaintiff had been rated above him by that selection panel and had been selected over Lovett.

101.   Doug Holbrook did not rank Lovett as his top choice for the CEO position.

102.   Dr. Wilson-Merritt stated that Lovett had leadership experience as a CEO with Kindred Hospitals and that he had been above to gain JCAHO accreditation for those facilities. Lovett had no mental health experience for a facility which housed 216 mental health.

- 32 -

103.   She also stated that she thought Plaintiff was knowledgeable and had "a ton of education" and that Plaintiff provided very detailed information during her interview.   Merritt-Wilson countered that opinion with a statement that Plaintiff was not "concise" either on "on paper [or] in her interview" which was a desired characteristic for a CEO.

104.   As justification for his rating for Plaintiff's interview performance, Holbrook offered that candidates other than Plaintiff "spoke with more clarity and concision" and "seemed to present their experiences in a different, better way."

105.   Wilson-Merritt noted that Lovett's experience in "Joint Commission accreditation" was both a factor in his selection and the reason for selecting him over Plaintiff.   As stated above, however, JCAHO accreditation was not relevant because of the decision by NCDPS to pursue accreditation under ACA standards. In addition, in 2018, CPHC underwent a comprehensive ACA review of its medical services, in which Plaintiff played a key role as the interim CEO.

106.   A "justification hiring memo" was drafted and authored by Wilson-Merritt and stated that Lovett was chosen as the top candidate because of:

- his master's degree in Healthcare Administration;

- his hospital CEO experience (over 9.5 years with Kindred Hospital facilities);

-  his (9 years) of experience, including as a licensed practical nurse ("LPN"), with providing healthcare in a (federal) correctional setting; and

- his experience with the JCAHO accreditation process.

- 33 -

107. The memo also compared Plaintiff's experience to Lovett's even though she purportedly was not even ranked as the second most qualified applicant by the interview panel. The memo described Plaintiff's experience as follows:

- Admittedly, like Plaintiff had a master's degree in health care administration;[1]

- Plaintiff's CEO experience was limited to the 2 ½ years that she acted in the Interim CEO position at Central Prison Hospital;

- Plaintiff had no health care administration experience between 1981 and 2010.

Based on these factors,[2] Wilson-Merritt's memo concluded that Plaintiff had significantly inferior experience as a CEO as compared to the chosen candidate, Chad Lovett.

108. Reuben Young reviewed that memo. Young stated that Lovett was hired over Plaintiff due to his "superior applicable experience."

109. Lovett was found to have had experience superior to Plaintiff's even though he had no prior experience in the North Carolina correctional system, compared to Plaintiff's 13 years of experience in the North Carolina correctional system. Lovett's nine years of CEO experience with Kindred facilities was not comparable to Plaintiff's experience and excellent evaluations in the two plus years she served in the actual

---

[1] Plaintiff also had an MBA.

[2] Plaintiff's lengthier, more relevant experience with the State correctional system and the fact that she had more relevant ACA accreditation standard experience applicable to CPHC was not mentioned in the memo.

- 34 -

position being filled for several reasons, including the fact that Lovett did not have CEO experience in a State (or federal) correctional setting. Nonetheless, Defendants' deemed Lovett's experience superior to Plaintiff's experience.

110.   Judge Young stated that he made the initial decision to hire Chad Lovett based on the application materials, the interviewers' score sheets of each applicant's interview, and Wilson-Merritt's memorandum. Thereafter, Judge Young conferred with and obtained approval from Defendant Hooks to offer Lovett the CEO position which he accepted.

111.   On December 12, 2018, Defendant notified Plaintiff that her temporary assignment as Acting/Interim CEO for Central Prison Hospital was ending and that she was being returned to her permanent position of Pharmacy Director at the Central Pharmacy.

112.   On that same date, Plaintiff had a meeting scheduled with Director of prisons Lassiter and Twyla Philyaw, a human resources resource employee working for Lassiter. Plaintiff was aware that Defendant Thomas and her assistant Fitzgerald had been given significant salary increases in 2017, but had failed to ensure that Plaintiff's position was awarded the same change in salary.  In the meeting, Lassiter told Plaintiff that it had not gone unnoticed that Thomas and Debra had increased their salaries and failed to also address Plaintiff's salary in-equity. He also said he noticed that Thomas got her salary very close to what Plaintiff was making as the CEO.  Lassiter indicated that her position would be given a higher salary.

- 35 -

113.  Philyaw expressed visible unhappiness with this decision.  She worked with Defendant Catlett in the Randall building and had likely heard negative comments by Catlett regarding Plaintiff.  Plaintiff had observed Defendant Catlett and Philyaw together on many occasions.  Moreover, Plaintiff had no previous working relationship with Philyaw from which any negative impressions could have originated.

## POST-SELECTION DISCRIMINATION AND RETALATION

114.  On December 17, 2018, Director Lassiter asked that Plaintiff meet with him and Thomas. Plaintiff knew that Thomas had been disparaging Plaintiff to others for several years now and that that disparagement had been one of the reasons Plaintiff did not get the CEO position. Plaintiff was very concerned about the meeting and asked Lassiter if Plaintiff could have someone with Plaintiff or tape the conversation. He said no and he would make sure the meeting was appropriate.

115.  In the meeting, Thomas said she would review Plaintiff's work duties. She said Plaintiff was to be on-site at CPHC two full days on Tuesday and Thursdays and NCCIW a half-day on Fridays and cover for the supervisors when they were out.

116.  Plaintiff knew that the duties being assigned were not commensurate with the duties assigned to her prior to leaving Central Pharmacy to be the interim CEO and she said so. Plaintiff also expressed that Thomas was treating her differently and that Thomas had intentionally ignored the CPHC pharmacy operation while Plaintiff was the CEO, even thought she had was the Pharmacy Director for statewide services. Plaintiff expressed concern because she believed that Thomas had treated her

- 36 -

differently from other employees and had done so to try and discredit Plaintiff and the CPHC operation for which Plaintiff was responsible.

117.   Plaintiff strongly felt Thomas's actions were related to Plaintiff being in the CEO position which she thought Plaintiff should not be in.  Plaintiff expressed her concerns about Thomas's directives to her in the meeting to Lassiter.  Thomas gave her a list of directives in the meeting and Plaintiff did her best to write them all down.

118.   Plaintiff reported to Apex Central Pharmacy on that same day and found many staff to be cold and distant.  The distress Plaintiff felt at returning to what was obviously going to be a hostile work environment caused her to see her health care provider who recommended she take some leave to develop some way to deal with her feelings that she was entering a stressful and anxiety-producing work situation.

119.   While Plaintiff was out on leave, she decided to seek legal advice about the hostile work environment she felt she was being subjected to because of her sex and age and possibly her race.  She signed an engagement letter with Michael Byrne on January 8, 2019.  Byrne advised her to file a grievance alleging she was a whistleblower and that she had been denied promotion in violation of the State employee preference in promotion law, but instructed her not to file a grievance alleging discrimination or it would stop his representation of Plaintiff.  The engagement letter signed by Plaintiff stated the same information.

120.   Plaintiff hoped while Plaintiff was out that Plaintiff's absence would help diminish the hostility towards her. However, in fact, the hostility increased when Plaintiff returned.  When Plaintiff returned to Central Pharmacy, Defendant Thomas

and Fitzgerald treated Plaintiff on the best of occasions with indifference and on the worst of occasions with hostility.

121.   When Plaintiff returned to Central Pharmacy, Thomas had significantly changed Plaintiff's job duties.  Plaintiff was immediately excluded from meetings with them (which Plaintiff had had almost every day prior to the CEO position) and was excluded from meetings between them and the other supervisor staff (some who reported to Plaintiff, excluded from lunch with them, excluded from email correspondence and generally treated in a hostile manner.

122.   After Plaintiff's re-assignment to Apex under her supervision, Thomas engaged in a merciless campaign to undermine Plaintiff and to sabotage Plaintiff's work by assigning Plaintiff so many tasks which Thomas acknowledged to others she knew Plaintiff could not complete.

123.   As just one example, upon Plaintiff's return to Apex,  Plaintiff was told Plaintiff was responsible for implementing the USP 800 Hazardous Drug program which had a deadline of December 1, 2019.  Plaintiff had notes from a meeting with Astrid Amico, previous pharmacy supervisor, that stated Central Pharmacy had discussed the implementation of USP 800 as early as April 2017 in a supervisors' meeting.

124.   Despite the passage of two years, Defendant Thomas had not taken any action to inform staff of the USP 800 Hazardous Drug program and thus pharmacy staff had needlessly been exposed to Hazardous Drugs (HDs) for much of that time due to inaction, when, instead, simple precautions could have been implemented to address

many of the exposure concerns. When Plaintiff learned that Central Pharmacy had taken no steps to implement the USP 800 HD program, Plaintiff inquired about the delay in implementation not knowing whether there was a legitimate reason for the delay. Her inquiry was met with hostility.

125. After her return to Central Pharmacy, Thomas undermined Plaintiff's supervision of employees assigned to her. On March 26, 2019, Plaintiff went to Barbara Lee and Merrill (Chip) Miller's (Lee and Miller reported to the Plaintiff) office looking for Ruth O'Neil and Crystal Carlson, the Technician Supervisors). The door was closed. Plaintiff knocked and opened the door. Thomas was in the office with all four supervisors and proceeded to turn a piece of paper over so Plaintiff could not see it, stopped talking and frowned at her. Plaintiff felt belittled and humiliated because both Lee and Miller reported to Plaintiff.

126. Sometimes the hostility was less subtle. Plaintiff was one of the last to leave a meeting in Thomas' office on April 23, 2019, when Thomas looked up at Plaintiff and said that "the choices people make affect them the rest of their lives." She then looked down and smiled. It was unrelated to the content of the meeting and Plaintiff felt very threatened.

127. Plaintiff continued to be the lowest paid of all the DPS and DHHS Pharmacy Directors, even when compared to a new hire at a different agency with pharmacists, the NC Department of Health and Human Services (NC DHHS). Notably, most NC DHHS Pharmacy Directors have responsibility for only one facility at a time. Upon her turn to Central Pharmacy, Plaintiff had oversight over three pharmacies:

- 39 -

Central Pharmacy, Central Prison pharmacy and the Women's Prison pharmacy. Plaintiff's was also responsible for overseeing the distribution of pharmacy services to over 55 prison facilities statewide. Plaintiff made less than the Pharmacist supervisor Plaintiff supervised at CPHC. Plaintiff asked Thomas to correct the disparity. She refused.

128. On April 11th, Defendant Thomas directed Plaintiff to start copying Fitzgerald on all of her pharmacy emails and to copy Defendant Thomas on any emails she sent which went to anyone other than NC DPS pharmacies. Plaintiff felt certain no other employees in her position were being asked to do so. Plaintiff was given a list of Plaintiff's job duties. Plaintiff asked Thomas again for the list from the discussion that Plaintiff was given during the December 2018 meeting with Kenneth Lassiter. Thomas told her that if she asked for that list again, she would be charged with insubordination.

129. Plaintiff took five days of the end of April and the beginning of May to prepare for a grievance hearing. When Plaintiff returned Defendant Thomas' hostile behavior increased.

130. On June 4th, Plaintiff was asked to go to Thomas's office to meet with Thomas and Fitzgerald. Plaintiff told Thomas that Plaintiff needed Chip Miller's help on USP 800. Thomas told Plaintiff that he was helping Thomas and could not help Plaintiff. Plaintiff later found out from Chip Miller that he had plenty of time to help Plaintiff.

131. At some point, Defendant Thomas told Plaintiff that she and Fitzgerald were tracking Plaintiff's attendance. Plaintiff asked why they were tracking Plaintiff's

attendance and she would not answer. Plaintiff told Defendant Thomas that she was treating Plaintiff very differently, that it was obvious to the staff, and that the treatment was greatly affecting the staff and how they treated Plaintiff.

132.    Thomas commented that Plaintiff had been back at Central Pharmacy for some time, with the implication being that Plaintiff had not completed enough of her assigned directives from Thomas. Plaintiff explained that she had only been in in place 19 workdays since getting Plaintiff's job duty assignment and that Plaintiff was still trying to understand the operation after being gone for almost three years.

133.    Thomas then indicated that she and Fitzgerald wanted a business plan by June 10 for how USP 800 HD program was going to be implemented.  Plaintiff pointed out that they had known about the need to implement USP 800 since April 2017 and had just assigned it to Plaintiff upon her return to Central Pharmacy. Plaintiff also noted that NC DHHS had been working on implementing USP 800 for over two years. Plaintiff stated that they were trying to blame Plaintiff for their failure to implement a program which they should have started two years ago.

134.    Plaintiff was asked to write plans, power points, agendas, and minutes for a USP 800 meeting. Plaintiff asked for examples of their previous project plans, agendas, minutes, and power points, so that Plaintiff could be sure Plaintiff was doing them the way Thomas and Fitzgerald wanted them done. They refused to give Plaintiff any help or assistance in meeting their expectations.

135.    Thomas and Fitzgerald said Plaintiff needed to go to CPHC two afternoons a week and Women's Prison one half day a week.  Plaintiff questioned why she was

- 41 -

being asked to do this because there was not enough work for Plaintiff to perform at those locations to justify that time assignment. Plaintiff noted that she had not spent that much time in the past and that when Fitzgerald was performing Plaintiff's duties, she only went to each location once a month. Plaintiff indicated that she needed the time onsite to work on the USP 800 implementation project assigned to her. Plaintiff also stated that CPHC would not appreciate the Plaintiff being there so often and it would create bad feelings.

136.    On June 4th, the hostility reached a peak when Thomas issued Plaintiff a Documented Counseling Session (DCS). Prior to the DCS, neither Thomas or Fitzgerald had told Plaintiff that she was doing anything incorrect on the new tasks assigned to Plaintiff. Plaintiff was following the process that was in place prior to leaving for the CEO position.

137.    In issuing the DCS, Thomas stated that the DCS had the support of management. When Plaintiff asked who was involved, Thomas declined to answer. Plaintiff expressed her disappointment that Thomas and Fitzgerald had not given Plaintiff any prior indication that they thought Plaintiff was doing anything wrong. Plaintiff had just been told by Thomas via email on May 15, 2019, that there were no problems with Plaintiff's performance. Plaintiff knew that supervisors were required to talk to an employee about deficiencies before giving the employee a DCS. Thomas told Plaintiff that was "only" a counseling session, yet it eventually affected Plaintiff's performance evaluation rating.

138.    The basis for the DCS was, according to them, that Plaintiff did not review a single Direct Processing Vendor form called a CNTR on May 16, 2109, and that she did not review an Inventory Adjustment in a timely manner. Both tasks were new pharmacy assignments the Plaintiff had not had any feedback on and that Plaintiff thought she was not doing anything wrong. Moreover, on May 9, 2019, Thomas knew that Plaintiff was leaving work to catch a flight for an emergency visit to Plaintiff's father and that she had left the CNTR in Fitzgerald's mailbox (as Plaintiff had always done in the past), for Thomas or Fitzgerald to review. They did not tell Plaintiff the practice had changed. Regarding the inventory adjustment, Plaintiff told Fitzgerald and Thomas that Plaintiff had not been given a timeframe and in the past when Fitzgerald did them, she did not get them done for weeks. Plaintiff stated she could easily have done so.

27.    Thomas also told Plaintiff that she had not submitted the synopsis of CPHC and Women's Prison visits in a timely manner. Plaintiff responded Fitzgerald made it clear to Plaintiff the USP 800 Hazardous Drug implementation was Plaintiff's priority. Plaintiff also told Defendant Thomas in May that Plaintiff would not be able to submit the summaries regularly due to her work on the USP 800 project and Thomas did not comment that it was a problem at that time. Thomas and Fitzgerald then told Plaintiff that she did not submit the hazardous drug list to Cardinal Healthcare as discussed in the May 22, 2019 meeting. Plaintiff told them that after being told the Cardinal contract renewals did not start until July 1st, Plaintiff understood that it was decided in the meeting that they would wait to send the list since it would most likely

need to be changed again.

139.   Plaintiff stated that she believed that she was being treated differently from other employees and being held to a different standard than other staff. Plaintiff indicated that the usual standard of practice in the pharmacy was to engage in verbal discussions with employees prior to issuing a DCS. Plaintiff asked if any other employee had been issued a DCS in the last 3 years.

140.   Plaintiff again questioned why she was being treated differently from other staff.  Thomas indicated that Plaintiff had to stop sending accusatory emails because they were not true and she was going to start treating them as unacceptable personal conduct.

141.   Plaintiff also asked Plaintiff's direct reports, Barbara Lee and Merrill (Chip) Miller, when was the last time they issued a DCS. They responded that they had never done so and neither had the Technician Supervisors, Ruth O'Neal and Crystal Carlson. Plaintiff found out later that the DCS ensured that she could not receive an Exceeds Expectations on Plaintiff's 2018-19 Performance Plan. Defendant Thomas knew Plaintiff had only received Outstanding and Exceeds Expectations prior to Plaintiff's return to Central Pharmacy in Apex.

142.   The DCS given to Plaintiff was for such insignificant errors compared to errors which were actually dangerous that others engaged in. As one example, upon Plaintiff's return to Central Pharmacy in April, Plaintiff found there were about seven bottles of expired ethyl chloride, which is highly flammable, stored in a carboard box on a high shelf in the recovery room which is in the warehouse.  Plaintiff immediately went

to Fitzgerald to express Plaintiff's concerns and asked why it was not in the non-flammable cabinet where it should have been stored and asked where the old non-flammable cabinet was. Fitzgerald and Thomas knew it was against the law to not store these items in any location other than a non-flammable cabinet.

143.   Fitzgerald and Thomas were very annoyed with Plaintiff, because they were very aware that the flammable bottles were not stored in a non-flammable cabinet and that they had been stored in a cardboard box on a shelf.  Thomas told Plaintiff that the old non-flammable cabinet was disposed of because it was "too big."  She then told Plaintiff to go and purchase a non-flammable cabinet, which Plaintiff did. But Thomas did not address this serious and dangerous violation of law with anyone and no one received a DCS, yet Plaintiff received a DCS for an insignificant error when compared to the violation of law with regard to a hazardous chemical.

144.   As another example, when implementing the USP 800 program Plaintiff Thomas and Fitzgerald discovered that a hazardous drug called finasteride had been placed in the robotics machines which was totally unacceptable and dangerous to the employees. Not one DCS was given to any supervisor to address this serious mistake.

145.   After the DCS, when Plaintiff discovered serious problems involving other employees like Plaintiff who were under Thomas's  supervisions, (Ruth O'Neal, Mike Lingenfelter, Chip Miller) she brought the issues to Thomas and Fitzgerald's attention and asked how they would like Plaintiff to address these problems since it seemed like a precedent had been set with the DCS Plaintiff received. Plaintiff also documented the situations via email to Thomas and Fitzgerald.

- 45 -

146. Plaintiff filed several internal complaints and requests for temporary reassignment due to the hostile work environment. The first request was sent to Timothy Moose, Chief Deputy Secretary on June 13, 2019. Plaintiff stated Plaintiff a memo that Plaintiff was under constant retaliatory behavior and it was impossible for Plaintiff to supervise her staff appropriately.

147. On June 25, 2019, Moose sent Plaintiff an email stating he was referring Plaintiff's request to Deputy Secretary Chris Holland for review and a response. Mr. Holland denied Plaintiff's request in an email on July 1, 2019. Most disturbing was that he asked that Plaintiff address Plaintiff's concerns with Plaintiff's supervisors, Defendant Thomas and Fitzgerald, the two individuals who were being discriminatory and harassing, and who had created the hostile workplace. Plaintiff had already asked Defendant Thomas and Fitzgerald to stop harassing Plaintiff, to no avail. Plaintiff then asked Holland if he would meet with Plaintiff to discuss Plaintiff's concerns.

148. Plaintiff also learned that Defendant Thomas and Deborah had arranged for salaries increases to occur in July 2019 for themselves and not Plaintiff. Also, Thomas and Fitzgerald also took three-day weekends every week by scheduling themselves to work four ten hour days. No other staff were allowed this schedule except Carlson and O'Neal.

149. On July 9, 2019, Thomas and Fitzgerald met with Plaintiff to sign off that Plaintiff had "improved her performance" per the DCS issued on June 4, 2019. They told Plaintiff that she was being released from the DCS.

- 46 -

150.    On July 17, 2019, Plaintiff asked Thomas and Fitzgerald to send her to a USP 800 training which cost less than $500 and would provide Plaintiff with critical knowledge about implementing the program by the December 1, 2019 deadline.  Plaintiff was told that there was not enough money to send Plaintiff, a decision that went to Defendant Catlett. Plaintiff was finally able to attend a training in September and what she learned caused NCDPS to have to re-vamp much of the work already done.

151.    Plaintiff was finally able to meet with Holland on Friday, July 26, 2019, at 11 am. He proceeded to ask Plaintiff to write a memo or send an email stating what things had occurred which would justify the reassignment. He asked how long it had been going on and Plaintiff said several years, since Plaintiff took the CEO position, and it also involved Catlett, Director of Health Services. The meeting took 20 minutes.

152.    On July 31, 2019, Plaintiff sent an email and six-page memo to Chris Holland, per his request, providing him with examples of the harassment and discrimination to which Plaintiff had been subjected.   Plaintiff learned later that Holland had forwarded Plaintiff's reports her supervisors to Defendant Thomas and Fitzgerald at some point.

153.    On August 27, 2019, Plaintiff had another USP 800 multidisciplinary meeting. Plaintiff receive very positive comments about how Plaintiff organized that meeting and all the work being accomplished in a short time.

154.    After the meeting, Chad Lovett who had replaced Plaintiff as CEO, sent Plaintiff an email in which he accused Plaintiff of showing disgust, frustration, irritation, and indicated that she had lost her focus and stumbled in conversation. Mr.

- 47 -

Lovett's email then stated that staff (Plaintiff's prior staff) had complained about Plaintiff to him about Plaintiff. Lovett made it clear Plaintiff was not welcome in "his" facility, but Plaintiff unfortunately was required by Defendant Thomas and Fitzgerald, her supervisors, to go there as part of Plaintiff's job duties and responsibilities.

155. Plaintiff was well aware of the individuals probably referred to by Lovett as they were staff who Plaintiff had held accountable while working as interim CEO. For example, Karen Marlowe, Assistant Director of Nursing and friend of Terri Catlett, and Don McLeod, CPHC Business Officer, had both received Documented Counseling Sessions during Plaintiff's tenure as the CEO.

156. On September 3, 2019, Holland sent Plaintiff a response dismissing Plaintiff's concerns and once again denying Plaintiff's reassignment.

157. After the August 27th email from Lovett, Plaintiff called Phyllis Miller, NCCIW Pharmacy Supervisor, and later Dr. Karen Steinour, Director of Risk Management, to ask how they thought the meeting went. Both of them confirmed that the meeting had gone well.

158. At some point, Plaintiff also learned that after Chad Lovett became CEO, Terri Catlett regularly met with him, which was in complete contrast to her treatment of Plaintiff when she was the interim CEO.

159. At some point after the August 27 email from Lovett, while Plaintiff was on one of her required visits to CPHC, Plaintiff went to the administrative area to find Dr. Metiko, CPHC Medical Director. Lovett stepped into the hallway to talk to Plaintiff.

HIs first comment to Plaintiff was that when he had found out how old Plaintiff was, he couldn't believe it. Plaintiff was taken aback and speechless.

160.    Lovett's comment on Plaintiff's age made Plaintiff very uncomfortable, especially after the email he had sent to Plaintiff on August 27th. When Plaintiff turned that she was OCD. Plaintiff replied that she had never had anyone say that to her and that most people referred to her as "detail oriented."

161.    The first week of September Plaintiff was asked to meet several times with Defendant Thomas and Fitzgerald about the USP 800 project Assessment of Risks (AORs) which Plaintiff had been working on for months. On September 5, 2018, Fitzgerald verbally attacked Plaintiff on several occasions. After an hour, in front of a subordinate, Fitzgerald's tone escalated and she accused Plaintiff of taking excessive time off work. (Plaintiff had taken four days of vacation during the summer.) Plaintiff was taking notes and Fitzgerald said to her sarcastically, "please, write it down." Plaintiff was embarrassed and humiliated at the comments which were witnessed by a co-worker sitting next to Plaintiff.

162.    In this same meeting, Plaintiff mentioned that Lovett, CPHC CEO, and Kim Tomlin, CPHC Pharmacy Supervisor were still leaving Plaintiff off emails impeding her ability to provide them with the advice and supervision she was required to provide as part of her duties and responsibilities. Fitzgerald got angry and asked Plaintiff what she was supposed to do. Plaintiff stated that she thought they had gotten a message to not include Plaintiff on the emails.

163.   Fitzgerald then told Plaintiff that she had not sent that message and if they did not want to include you, they did not get that message from her.  Fitzgerald then stated loudly, "and you can write that down and put lines under it!"

164.   Fitzgerald continued to berate Plaintiff and Defendant Thomas made no attempt to stop her.  Plaintiff became fearful and started to whisper hoping to calm her down. Plaintiff then whispered twice that she understood, hoping to pacify Fitzgerald. Fitzgerald then stopped and stated to Plaintiff, "and you need to be VERY careful," which Plaintiff understood to be a threat.

165.   Plaintiff then replied in a whisper that she would.  Fitzgerald then turned to Defendant Thomas said angrily that Plaintiff was writing "that one down also."  Then Debra turned to Plaintiff and accused her of attacking Fitzgerald and Defendant Thomas in the meeting.  Plaintiff replied shocked that she felt that she had been under attack.

166.   Fitzgerald then stated that Plaintiff's tone during the meeting had been "difficult."  Plaintiff responded that she felt like no matter what she did or how hard she worked, none of it was good enough. Plaintiff stated that she thought they should move the discussion along because of the amount of work that needed to be done.

167.   Plaintiff sent Holland another email on September 30th outlining Plaintiff's concerns, letting him know that the retaliation and harassment had escalated, even though she had attempted to address it, stating that she was being treated significantly differently than the other five supervisors, and again asking for a reassignment away from the hostile work environment.  On October 10, 2019, Holland

sent Plaintiff a response stating he would not consider the reassignment and that Plaintiff should seek help from EEOC.

168. On October 13, Plaintiff spoke with the previous warehouse manager, Jarvis Tart, who told her that Defendant Thomas and Fitzgerald had disparaged Plaintiff from the time Plaintiff started the CPHC CEO position. Jarvis also indicated that Dennis Smith who worked in the Central Pharmacy warehouse had told Tart that he thought it was terrible the way Defendant Thomas and Fitzgerald had treated Plaintiff upon her return to Central Pharmacy.

169. On October 15, 2019, while at CPHC, Plaintiff ran into Sara Royster, HR Personnel Analyst. Royster told Plaintiff that she had received a call from an attorney in the Office of the Attorney General about Plaintiff's being denied promotion. Royster told Plaintiff that she had told the attorney that she knew that Plaintiff had been selected at least twice for the position.

170. On October 17th, Plaintiff also overheard Defendant Thomas telling staff that she and Fitzgerald had been doing everything they could to support Plaintiff and yet Plaintiff could still not get her work done. Plaintiff overheard this conversation in the pharmacy in the area where Lois Childs, Diane James, Suman Kenth, Lilliam Kidd, Linda Butz and several other pharmacists worked.

171. These remarks were similar to the remarks reported to Plaintiff as having been made by Defendant Thomas while Plaintiff was working as interim CEO. These remarks included statements such as Plaintiff "has changed," Plaintiff "wants the CEO

- 51 -

position," Plaintiff "did terrible things when we were friends she only learned about later."

172.   On October 17th, after over three hours in a meeting with Defendant Thomas and Fitzgerald during which they berated and criticized Plaintiff, Plaintiff finally stood up to leave the office unable to take more, and proceeded to faint in the hallway. As Plaintiff regained consciousness, she saw Fitzgerald standing over her. Fitzgerald grabbed Plaintiff's arm and Plaintiff asked that not to touch Plaintiff.  When Plaintiff that this happened because of the terrible way they had treated Plaintiff. Plaintiff went to her office.  Defendant Thomas and Fitzgerald then came to the door of Plaintiff's office and Fitzgerald asked if there was something she could do. Plaintiff told them that "they had done enough damage." Plaintiff asked to be left alone.

173.   Plaintiff then left the office for the rest of the day and called in sick the next day.  Plaintiff was reassigned to a different work location on October 21, 2019.

## COUNT ONE
## SEX DISCRIMINATION IN VIOLATION OF TITLE VII

174.   Plaintiff incorporates the allegations contained in ¶¶ 1 – 173 as though fully set forth herein.

175.   Plaintiff was a qualified older female employee for the position of CEO of CPHC.

176.   Plaintiff applied for the CEO position at CPHC and was selected on two different occasions as the most qualified applicant in the applicant pool.

177.   Defendants denied her promotion stating that she was not the most qualified applicant.

178.   Defendants' reasons for denying her promotion were pretextual.

179.   Plaintiff was treated differently from other younger male applicants in violation of her right to be free from sex discrimination under Title VII.

## COUNT TWO
## AGE DISCRIMINATION IN VIOLATION OF THE ADEA

180.   Plaintiff incorporates the allegations contained in ¶¶ 1 – 179 as though fully set forth herein.

181.   Plaintiff was a qualified older female employee for the position of CEO of CPHC.

182.   Plaintiff applied for the CEO position at CPHC and was selected on two different occasions as the most qualified applicant in the applicant pool.

183.   Defendants denied her promotion stating that she was not the most qualified applicant.

184.   Defendants' reasons for denying her promotion were pretextual.

185.   Plaintiff was treated differently from other younger male applicants in violation of her right to be free from age discrimination under the ADEA.

186.   Plaintiff has suffered damages as a result of Defendants' violations of Title VII.

## COUNT THREE
## RETALIATION IN VIOLATION OF TITLE VII AND THE ADEA

- 53 -

187.    Plaintiff incorporates the allegations contained in ¶¶ 1 – 186 as though fully set forth herein.

188.    Plaintiff protested the selection of a younger male applicant for the position by Defendants and was subjected to a hostile work environment.

189.    When Plaintiff protested the hostile work environment, she was also retaliated against by leaving her in the hostile work environment.

190.    Plaintiff suffered damages due to the retaliatory actions of Defendants.

## COUNT FOUR
## DEPRIVATION OF PLAINTIFF'S RIGHTS TO EQUAL PROTECTION UNDER THE UNITED STATES CONSTITUTION IN VIOLATION OF 42 U.S.C. § 1983

191.    Plaintiff incorporates the allegations contained in ¶¶ 1 – 190 as though fully set forth herein.

192.    Plaintiff was a qualified older female employee for the position of CEO of CPHC.

193.    Plaintiff applied for the CEO position at CPHC and was selected on two different occasions as the most qualified applicant in the applicant pool.

194.    Defendants denied her promotion stating that she was not the most qualified applicant.

195.    Defendants' reasons for denying her promotion were pretextual.

196.    Plaintiff was treated differently from other male applicants thus depriving her of her right to equal protection under the United States Constitution in violation of 42 U.S.C. § 1983.

197.    Plaintiff has suffered damages as a result of Defendants' violations of 42 U.S.C. § 1983.

## COUNT FIVE
## DEPRIVATION OF PLAINTIFF'S RIGHTS TO FREE SPEECH UNDER THE UNITED STATES CONSTITUTION IN VIOLATION OF 42 U.S.C. § 1983

198.    Plaintiff incorporates the allegations contained in ¶¶ 1 – 197 as though fully set forth herein.

199.    Plaintiff was qualified for the position of CEO of CPHC.

200.    While serving as the interim CEO of CPHC, Plaintiff alerted Defendants to many issues of public concern including but not limited to the excessive and inappropriate expenditures of State funds and the violations of policies and procedures which endangered the safety of employees, inmates, and the general public.

201.    Plaintiff applied for the CEO position at CPHC and was selected on two different occasions as the most qualified applicant in the applicant pool.

202.    Defendants denied her promotion stating that she was not the most qualified applicant.

203.    Defendants' reasons for denying her promotion were pretext for adverse actions taken against her, including denying her promotion and subjecting her to a hostile work environment because she exercised her right to free speech under the United States Constitution about a matter of public concern in violation of 42 U.S.C. § 1983.

204.    Plaintiff has suffered damages as a result of Defendants' violations of 42 U.S.C. § 1983.

## COUNT SIX
## DEPRIVATION OF PLAINTIFF'S RIGHTS TO EQUAL PROTECTION UNDER THE UNITED STATES CONSTITUTION IN VIOLATION OF *CORUM V. UNIVERSITY OF NORTH CAROLINA*

205.    Plaintiff incorporates the allegations contained in ¶¶ 1 – 204 as though fully set forth herein.

206.    Plaintiff was qualified for the position of CEO of CPHC.

207.    Plaintiff applied for the CEO position at CPHC and was selected on two different occasions as the most qualified applicant in the applicant pool.

208.    Defendants denied her promotion stating that she was not the most qualified applicant.

209.    Defendants' reasons for denying her promotion were pretextual.

210.    Plaintiff was treated differently from other male applicants thus depriving her of her right to equal protection under the North Carolina Constitution in violation of *Corum v. University of North Carolina.*

211.    Plaintiff has suffered damages as a result of Defendants' violations of Plaintiff's State constitutional rights protected under *Corum v. University of North Carolina.*

## COUNT SEVEN
## DEPRIVATION OF PLAINTIFF'S RIGHTS TO FREE SPEECH UNDER THE NORTH CAROLINA CONSTITUTION IN VIOLATION OF *CORUM V. UNIVERSITY OF NORTH CAROLINA*

212.    Plaintiff incorporates the allegations contained in ¶¶ 1 - 211 as though fully set forth herein.

213. Plaintiff was qualified for the position of CEO of CPHC.

214. While serving as the interim CEO of CPHC, Plaintiff alerted Defendants to many issues of public concern including, but not limited to, the excessive and inappropriate expenditures of State funds and the violations of policies and procedures which endangered the safety of employees, inmates, and the general public.

215. Plaintiff applied for the CEO position at CPHC and was selected on two different occasions as the most qualified applicant in the applicant pool.

216. Defendants denied her promotion stating that she was not the most qualified applicant.

217. Defendants' took adverse actions against Plaintiff, including denying her promotion and subjecting her to a hostile work environment, because she exercised her right to free speech under the North Carolina Constitution in violation of *Corum v. University of North Carolina*.

218. The reasons given for the adverse actions against Plaintiff were pretextual.

219. Plaintiff has suffered damages as a result of Defendants' violations of Plaintiff's State constitutional rights protected under *Corum v. University of North Carolina*.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully prays that this Court:

1. That this Court issue an injunction directing Defendant Hooks to hire Plaintiff as the CEO of the CPHC;

2. That this Court enjoin the Defendant from discriminating against

Plaintiff on the basis of her sex and age in the terms and conditions of employment;

3.     That this Court order Defendant to make whole Plaintiff by providing her with appropriate lost earnings and other lost benefits, with prejudgment interest, in amounts to be proved at trial, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices, including, but not limited to, reinstatement;

4.     That this Court order Defendant to make whole Plaintiff by providing her with compensation for nonpecuniary losses resulting from Defendant's unlawful employment practices, including emotional pain, suffering, inconvenience, and mental anguish in amounts to be proven at trial;

5.     That this Court award the Plaintiff reasonable attorney's fees and the other costs of this action;

6.     That this Court award Plaintiff such other and further relief as may be just and equitable.

## JURY TRIAL DEMANDED

Plaintiff request a jury trial on all questions of fact raised by the Complaint.

- 58 -

Respectfully submitted, this the 17th day of May 2021.

/S/ VALERIE BATEMAN
 NC State Bar: 13417
 T/F 919-436-3592
 FORREST FIRM, P.C.
 406 Blackwell St., Suite 420
 Durham, NC 27701
 valerie.bateman@forrestfirm.com

/S/ RACHEL M. BLUNK
 NC State Bar: 42694
 T/F 336-663-1052
 FORREST FIRM, P.C.
 125 S Elm St., Suite 100
 Greensboro,  NC 27401
 rachel.blunk@forrestfirm.com

*Attorneys for Plaintiff*

## VERIFICATION OF JUDITH KNECHTGES

JUDITH KNECHTGES, being duly sworn, deposes and says:

That the contents of the foregoing Complaint about which she has knowledge are true to her own knowledge, except as to matters stated on information and belief, and as to those matters, s/he believes them to be true.

_JUDITH KNECHTGES_

Subscribed and sworn to before Plaintiff this day

By JUDITH KNECHTGES

on the 17th day of May 2021.

_NOTARY PUBLIC_

My Commission Expires:

12/7/2021