| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE OFFICE OF ADMINISTRATIVE HEARINGS |
| COUNTY OF WAKE | 20 OSP 02124 |

| | |
|---|---|
| Judith Knechteges<br>　　　Petitioner,<br><br>v.<br><br>NC Department of Public Safety<br>　　　Respondent. | **FINAL DECISION** |

This contested case was heard before Administrative Law Judge Melissa Owens Lassiter on August 28, 2020 in the Office of Administrative Hearings in Raleigh, North Carolina, pursuant to N.C. Gen. Stat. § 150B-23 and Chapter 126 of the North Carolina General Statutes, and Petitioner's contested case petition alleging a denial of a promotion based upon retaliation and violation of the Whistleblower Act.

## APPEARANCES

For Petitioner:　　　Jennifer J. Knox, Esq.
　　　　　　　　　　The Law Office of Jennifer Knox, PC
　　　　　　　　　　Raleigh, North Carolina

For Respondent:　　Norlan Graves
　　　　　　　　　　Assistant Attorney General
　　　　　　　　　　North Carolina Department of Justice
　　　　　　　　　　Raleigh, North Carolina

## ISSUE

Whether Respondent retaliated against Petitioner, in violation of N.C. Gen. Stat. §§ 126-34.02(b), 126-84, and 126-85 by selecting another applicant for the Hospital Chief Executive Officer Position and denying Petitioner a promotion to that position?

## GOVERNING STATUTES AND RULES

N.C. Gen. Stat. § 150B-1, *et seq.*
N.C. Gen. Stat. §§ 126-34.02, 126-84, 126-85
25 NCAC 01J .0600, *et seq.*

## EXHIBITS ADMITTED INTO EVIDENCE

For Petitioner:     1, 2

For Respondent:     1 - 4

## WITNESSES

For Petitioner:     Judith Knechteges

For Respondent:     The Honorable Reuben F. Young, Associate Judge, North Carolina Court of Appeals
Dr. Lewis Peiper, Interim Director of Behavior Health Services
Douglas Holbrook, Chief Financial Officer for Respondent
Dr. Anita Wilson-Merritt, Central Prison Medical Director

## PARTY REPRESENTATIVES

Petitioner's party representative was Petitioner, Judith Knechteges. Respondent's representative was Dr. Anita Wilson-Merritt.

## PREHEARING MOTIONS

On August 19, 2020, Respondent filed a Motion to Dismiss Petitioner's claim regarding promotional priority consideration based upon *res judicata*. Petitioner had previously filed the same claims asserted in this contested case against Respondent in contested case 19 OSP 01028. On September 11, 2019, the undersigned granted Summary Judgment for Respondent and dismissed Petitioner's promotional priority consideration claim in contested case 19 OSP 01028. On October 1, 2019, Petitioner's counsel filed a Voluntary Dismissal without prejudice in 19 OSP 01028.

After hearing arguments at this hearing, and considering Respondent's Motion to Dismiss, the undersigned granted Respondent's Motion to Dismiss Petitioner's promotional priority consideration claim in this case based upon *res judicata*. The Tribunal also granted Petitioner's pretrial Motion to Sequester all witnesses.

## FINDINGS OF FACT

**BASED UPON** careful consideration of the sworn witness testimony at hearing, the exhibits received and admitted into evidence, the entire record in this proceeding, having assessed the credibility of the witnesses by judging credibility of each witness including, but not limited to the demeanor of the witnesses, any interests, bias, or prejudice the witness may have, the opportunity of the witness to see, hear, know or remember the facts or occurrences about which the witness testified, whether the

testimony of the witness is reasonable and whether the testimony is consistent with all other believable evidence in the case, the undersigned hereby finds:

1. Petitioner is a career status State employee subject to the North Carolina State Human Resources Act and is currently employed as the Pharmacy Director for the Central Pharmacy in Respondent's North Carolina Department of Public Safety.

2. Petitioner has an undergraduate degree in Pharmacy, a Master of Business Administration degree with a concentration in Finance and Marketing, and a Master of Health Administration degree. (T. p. 15)

3. Respondent's Central Pharmacy is the main site for pharmacy services for all prisons operated by the State of North Carolina and is located at the Central Prison Healthcare Complex Facility (CPHCF) in Raleigh, North Carolina. The Central Pharmacy provides pharmacy care for approximately 37,000 inmates and dispenses approximately 5,000 prescriptions per day. (T. pp. 16-17)

4. Around January 2010, Petitioner became the Pharmacy Director at Central Pharmacy for Respondent. (T. p. 97) As Pharmacy Director, Petitioner managed Respondent's prison and medical facilities throughout the state, supervising three (3) employees directly and sixty (60) employees indirectly. (T. p. 98)

5. The CPHCF includes a Regional Medical Center that has 120 medical beds and Mental Health Facility that contains 216 mental health beds. The Regional Medical Center provides inpatient and outpatient services, including emergency, urgent, acute, infirmary and chronic levels of healthcare, preventive medicine, and rehabilitative healthcare. The Mental Health Facility accepts inmates with acute and chronic mental health illnesses.

6. In 2015, Petitioner discovered numerous anomalies pertaining to the management of controlled substances. (T. p. 101) This discovery occurred around the time that Respondent was in the process of implementing electronic health records for the facility. (T. p. 101) Specifically, Petitioner discovered that while nursing staff was properly distributing controlled substances to patients from the automated dispensing cabinets known as "Omnicell," the nursing staff was not performing the proper documentation via the electronic health record. (T. p. 101) Petitioner reported these issues to Health Services. (T. p. 103)

7. Based upon Petitioner's reporting, a year-long internal investigation was conducted into the missing prescription drugs at the CPHCF and lack of proper accounting for such drugs. (T. p. 103) In addition, the U.S. Drug Enforcement Administration (DEA) and North Carolina Board of Pharmacy conducted investigations. (T. pp. 103, 123)

8. Ultimately, the United States Attorney's Office became involved. Respondent was found at fault and paid substantial fines as a result of the investigation. (T. pp. 103, 123)

9. The investigation further resulted in a vacancy in the position of Chief Executive Officer of the CPHCF. (T. p. 103)

10. On April 22, 2016, Respondent hired Petitioner as the Interim CPHCF Chief Executive Officer ("CEO"). (T. pp. 21-25) Petitioner's CEO duties included supervision of the Finance, Clinical Services, Administrative Services, and Accounting Departments, along with overseeing approximately 570 employees. (T. pp. 25-26) Petitioner received a pay raise of approximately $45,000 in that position. (T. p. 104)

11. By all accounts, Petitioner excelled as the Interim CPHCF CEO. Respondent's Interim Chief Deputy Secretary Reuben F. Young had "no reason to believe that she did not do a good job as the Interim CEO." (T. p. 141)

12. In her position as CEO, Petitioner uncovered multiple instances of gross mismanagement and waste of money at CPHCF. First, at the beginning of her tenure as CEO, Petitioner realized there were more pharmacists at the CPHCF than were necessary to complete the work required.

   a. A pharmacist can medically decide or determine what drug to administer to a patient. A pharmacy technician assists the pharmacist but cannot make decisions about which drugs to administer. (T. p. 30) While both persons can physically fill a prescription, it is much more cost efficient for the pharmacy technician to do so.

   b. The North Carolina Board of Pharmacy generally recommends that a pharmacist be allowed to supervise two pharmacy technicians. (T. p. 31)

   c. When Petitioner arrived at CPHCF, this ratio was completely askew, as there were approximately 43 pharmacists and only 21 pharmacy technicians. (T. p. 33). A pharmacist's salary within the Department of Public Safety is approximately $100,000, while a pharmacy technician makes around $40,000. (T. p. 33).

13. Petitioner proposed reducing the number of pharmacists and increasing the number of pharmacy technicians to bring the ratio in line with best practices recommended by the North Carolina Board of Pharmacy. Changing that ratio could save the State of North Carolina between $1,400,000 and $2,000,000 over a four-year period. However, Janet Brown, Pharmacy Director at DPS, denied Petitioner's request.

14. Second, Petitioner discovered a gross waste of money in the CPHCF Dental Clinic involving the contract oral surgeon, Dr. Waack. Dr. Waack required the other dentists to act as his scribe, enter patient data into the electronic health records, and

obtain prescription drugs from the pharmacy as needed for patients. (T. pp. 37-38) These were actions that could and should be performed by the dental technicians, and do not require the skill and training of dentists. However, over the years, Dr. Waack's practice had become the custom in the facility.

15. Petitioner informed Dr. Clare, the Director of Dental Services for DPS, and Terry Catlett, the Director of Health Services, of her discovery, and asked them to put the oral surgery services out for a competitive bidding process to see if they could save the State money. Dr. Clare and Ms. Catlett denied Petitioner's request.

16. Third, after becoming the Interim CEO, Petitioner reviewed prior internal audits that had been performed on CPHCF and discovered that the prior CEO had not resolved and/or corrected most of the action items identified in the prior audits. For example, no one at the facility had tracked the locations of hospital equipment, including laptop computers, for years. (T. pp. 46-47) In addition, no one had tracked the expiration of millions of dollars of encumbrance money to get an accurate picture of the budget. (T. p. 45). Petitioner remedied the unresolved issues with the prior internal audits. After that, in 2017, the CPHCF received the highest rating it had ever received. (T. p. 47)

17. Fourth, Petitioner learned that the CPHCF was renting specialized beds for non-mobile patients, at a cost of $17,000-$19,000 a month, rather than buying these beds. Petitioner saved the State of North Carolina $250,000 per year by buying the beds. (T. pp. 48-49)

18. Fifth, Petitioner instituted new personnel policies and discipline regarding staff reporting to work on time. Because the CPHCF was located within a prison, hospital staff could not simply leave at the end of their shift. Staff was required to wait until the next staff member arrived to relieve them. As a result, when staff arrived late for their shift, it created overtime costs for the facility. (T. pp. 50-51) By requiring staff to report to work on time, Petitioner saved the State money in the form of overtime hours paid.

19. Lastly, Petitioner uncovered a gross overpayment to the pathologist in the lab, Dr. Huey. Dr. Huey was paid as much as $30,000 a month for part-time work. When Health Services and Prisons was provided with an alternative, it was ignored. The standard practice in the community was to contract with a pathologist to review lab services. An outside pathology group, Eastern Carolina Pathology, could do similar work for around $3,000-5,000/month. (T. pp. 112-114)

20. Petitioner corrected all of the uncovered gross mismanagement and the waste of money she could and reported it to her supervisors. However, she was often met with resistance to change procedures because the people to whom she reported the mismanagement were the ones who should have already corrected such mismanagement. (T. p. 59)

21. In 2017, Respondent posted the Hospital CEO permanently. (T. p. 60). The CEO Position is an exempt managerial position that is not subject to protection under Article 1, Chapter 126, of the North Carolina Human Resources Act. (Pet. Ex. 1)

22. Petitioner applied for and was interviewed for the position by an interview panel consisting of Joe Prater, DPS Deputy Director over Health Services, Annie Harvey, Deputy Director of Operations for the Division of Prisons, and Dr. Sara Peebles with DHHS. Joe Prater told Petitioner that she was the most qualified candidate. Mr. Prater recommended that Petitioner be selected for the CEO position. (T. pp. 133-134)

23. Judge Reuben Young served as the Interim Chief Deputy Secretary of Respondent's Adult Corrections and Juvenile Justice from December of 2017 until April of 2019. When Judge Young joined Respondent in December of 2017, the interviews for the second CEO posting had already been conducted.

24. Due to some candidates being allowed to provide additional answers during the first set of interviews, and the fact that there was a statewide reclassification of positions, including the CEO position, Respondent reposted the job. (T. pp. 120, 134-135, 139-140).

25. Petitioner was not required to reapply or be interviewed for the second CEO position as she was still a viable candidate for the job. The same interview panel conducted interviews. (T. pp. 62-63) Petitioner was a top contender for the second job posting. According to Petitioner, Joe Prater told her she was the applicant selected for the job, and Sara Royster told her that she had been selected for the position three times. (T. p. 65). However, Respondent offered another candidate the position, but that person declined the offer. (T. p. 134)

26. On August 7, 2018, Respondent posted the Central Prison Hospital CEO position a third time. The August 7, 2018 posting specifically directed all prior applicants to resubmit their materials. (Pet. Ex. 1) The posting noted that this posting was a repost under the new State Classification and Compensation System, and that the CEO position was "Managerial Exempt" and is not subject to protection under Article I, Chapter 126, of the North Carolina Human Resources Act." (Pet. Ex. 1) The posting listed the following Minimum Education and Experience Requirements:

- Master's degree in Hospital Administration, Health Care Administration, or a clinical Human Resources field, **AND** six (6) years of hospital administrative experience.

    or

- Bachelor's degree in health care or business administration **AND** eight (8) years of hospital administrative experience.

    or

- An equivalent combination of education and experience.

(Pet. Ex. 1, emphasis in original)

27. The posting informed applicants of the "Knowledge, Skills and Abilities/Competencies," ("KSA") along with the minimum education and experience, required to be deemed "eligible" for the position. These KSAs included demonstrated knowledge of healthcare delivery system, operations and trends, state and federal standards, policies and regulations concerning healthcare administration, Joint Commission on Accreditation of Healthcare Organizations (JCAHO) certification standards, and business and management principles involved in strategic planning, resource, resource allocation, human resources, coordination of people and resources.

28. The CEO posting also listed Management Preference for those applicants who specified experience in:

- Previous executive-level experience at a correctional or involuntary custody behavioral or medical healthcare facility/institution.
- Demonstrated experience providing direction and working collaboratively with staff at all levels including physicians, nurses, technical, clerical service, maintenance, and other personnel.
- Proven ability to propose, monitor, analyze and adjust hospital budgets to achieve operational goals.
- Demonstrated experience with computerized record management systems used to store and process patient, and other related data.

(Pet. Exh. 1)

29. On August 19, 2018, Petitioner applied for CEO position.

30. Judge Young selected the interview panel for the CEO position this time, which consisted of Dr. Anita Wilson, then State Medical Director for the Division of Prisons; Annie Harvey, then Deputy Director of Operations for the Division of Prisons; and Doug Holbrook, Respondent's Chief Financial Officer. (T. pp. 64, 107, 142 162) (Resp. Ex. 4) Dr. Wilson-Merritt served as the Chair of the interview panel.

31. Annie Harvey was the only member of the third interview panel who had also served on the prior interview panels for the CEO position. Dr. Wilson-Merritt indicated at hearing that the third interview panel did not discuss that Petitioner had been the top candidate in the prior interviews. She explained that in the beginning of the interview process, Ms. Harvey:

> made it clear that 'I've been on previous interview panels, but please don't ask me about that. We're here to do an interview. So, we will judge based off what we see today.

7

(T. p. 197)

32. The interview panel interviewed Petitioner and four other candidates, two external and two internal, for the CEO Position. (Resp. Ex. 4)

33. After interviewing all applicants, Dr. Wilson-Merritt, Ms. Harvey and Mr. Holbrook discussed the applicants, their interviews, their applications, and what they felt may be beneficial for the Central Prison Hospital facility, including challenges the new CEO would face. (T. pp. 184-185) They "hashed out" whom they thought would be the best candidates and identified their top three candidates. (T. pp. 184-185) Dr. Wilson-Merritt agreed that while all three interviewers reached a consensus regarding who were the top three candidates, each person on the panel may not have had those top three in the same order. (T. p. 185)

34. The interview panel did not rate Petitioner as one of the top three candidates. In fact, Petitioner and one other candidate received the lowest interview scores; in other words, the panel rated three other candidates higher than Petitioner. (T. pp. 107, 142, 162, 184, 185) (Resp. Exs. 2-4) Based upon the interviews and application materials, the interview panel recommended their top two candidates to Judge Young, the hiring manager for the CEO position. The panel recommended Chad Lovett as their top candidate. (T. pp. 107, 142 162, 184) (Resp. Exs. 2, 3, 4).

35. Even though Mr. Holbrook did not rate Mr. Lovette as his top choice for the CEO position, he thought Mr. Lovette "had clear progressively responsible experience within a healthcare organization managing healthcare facilities . . . And I believe that gave the committee – the panel a great deal of confidence." (T. pp. 162-163) Dr. Wilson-Merritt indicated that Mr. Lovette had the leadership experience as a CEO with Kindred Hospitals. She explained that Kindred's setup was very similar to what Central Prison Healthcare Facility does with different departments such as radiology and operations, and multiple specialists come into the facility to see patients. In addition, Dr. Wilson-Merritt noted that Mr. Lovette was able to gain JCAHO accreditation for those facilities. (T. p. 180)

36. During the interviews, Mr. Holbrook looked for someone who exhibited "leadership qualities for decisiveness, for clarity of communication, and for vision." (T. p. 158) Both Mr. Holbrook and Dr. Wilson-Merritt described Petitioner's answers during the interview as disorganized, unfocused, and rambling. Mr. Holbrook noted that Petitioner "did not provide concrete examples of things for me to write down." (T. p. 161) At hearing, Mr. Holbrook opined that "[o]ther candidates spoke with more clarity and concision. They seemed to present their experiences in a different, better way." (T. p. 162)

37. Dr. Wilson-Merritt thought Petitioner was knowledgeable and had "a ton of education." She thought Petitioner provided very detailed information during her interview, but such information did not necessarily pertain to the bigger picture and answer the benchmarks of the interview questions. (T. p. 188)

38. Likewise, in reviewing Petitioner's application, Dr. Wilson-Merritt noticed that "there were a lot of words that were not concise thoughts." (T. p. 199) As a "CEO, you should be able to formulate your thoughts and be concise when you communicate with your staff. So, neither on paper nor in her interview was that demonstrated." (T. p. 199)

39. Judge Young made the initial decision to hire Chad Lovett based on the application materials, the interviewers' score sheets of each applicant's interview, and a memorandum detailing why the panel recommended Mr. Lovett for the CEO position. Thereafter, Judge Young conferred with and obtained approval from Respondent's Secretary, Erik Hooks, to offer Chad Lovett the CEO position. (T. pp. 121, 122, 156, 165) (Resp. Ex. 2, 3, 4).

40. Mr. Lovett was chosen as the top candidate because of his Master's Degree in Healthcare Administration, his extensive hospital CEO experience, and his experience as a licensed practical nurse ("LPN") administering healthcare in a correctional setting. Mr. Lovett had over 9 ½ years experience as a hospital CEO. Five of those years were with Kindred Hospitals and included three separate Kindred Hospital facilities. Mr. Lovett took all three of those facilities through the accreditation process with the Joint Commission Accreditation of Healthcare Organizations ("JCAHO"). One of those facilities was granted its initial accreditation under Lovett's leadership. (T. pp. 121, 122, 156, 165) (Resp. Exs. 2, 3, 4). Mr. Lovett also worked for nine years with the Federal Bureau of Prisons including working as a licensed practical nurse.

41. Mr. Lovett was offered and accepted the CEO Position.

42. While Petitioner had a Master's Degree in Health Services Management and Policy, her CEO experience was limited to the 2 ½ years that she acted in the Interim CEO position at Central Prison Hospital. Between 1981 and 2010, Petitioner's experience consisted of a territory manager for a pharmaceutical company and a pharmacist. She had no health care administrative work experience between 1981 and 2010 when she became a pharmacy director with Respondent's Central Pharmacy. Her work experience was limited to being a pharmacist and six years as a pharmacy director. As a result, Petitioner had significantly less experience as a CEO as compared to the chosen candidate, Chad Lovett.

43. On December 12, 2018, Respondent notified Petitioner that her temporary assignment as Acting/Interim CEO for Central Prison Hospital was ending and that she was being returned to her permanent position of Pharmacy Director at the Central Pharmacy.

44. Petitioner filed this Contested Case Petition on May 22, 2020, alleging that Respondent did not provide her with promotional priority and that they retaliated against her in violation of the Whistleblower Act, N.C.G.S. Chapter 126, Article 14, when they did not hire her for the CEO Position.

# CONCLUSIONS OF LAW

**BASED UPON** the foregoing Findings of Fact and the preponderance of the evidence in the whole record, the Undersigned concludes:

1. All parties are properly before this Administrative Law Judge and jurisdiction and venue are proper. Despite the due diligence of all parties, and the negative impacts of the COVID-19 pandemic on all parties and this Tribunal, the time for completing this matter exceeded the usual, regular, and customary time of completion. For that reason, extraordinary cause existed for the issuance of this Final Decision more than 180 days from the commencement of the case. N.C. Gen. Stat. § 126-34.02(a).

2. To the extent that the Findings of Fact contain Conclusions of Law, or that the Conclusions of Law are Findings of Fact, they should be so considered without regard to the given labels. *Charlotte v. Heath*, 226 N.C. 750, 755, 40 S.E.2d 600, 604 (1946); *Peters v. Pennington*, 210 N.C. App. 1, 15, 707 S.E.2d 724, 735 (2011); *Warren v. Dep't of Crime Control,* 221 N.C. App. 376, 377, 726 S.E.2d 920, 923, *disc. review denied*, 366 N.C. 408, 735 S.E.2d 175 (2012).

3. A court need not make findings as to every fact that arises from the evidence and need only find those facts which are material to the settlement of the dispute. *Flanders v. Gabriel*, 110 N.C. App. 438, 440, 429 S.E.2d 611, 612, *aff'd*, 335 N.C. 234, 436 S.E.2d 588 (1993).

4. Petitioner is a career state employee entitled to the protections of the North Carolina Human Resources Act (N.C. Gen. Stat. § 126-1, *et seq*.), and specifically the provisions found in N.C. Gen. Stat. §§ 126-34.02(b), 126-84 and 126-85. Because Petitioner has alleged that Respondent retaliated against her for engaging in protected activity, the Office of Administrative Hearings has jurisdiction to hear and issue the Final Decision in this matter.

5. Under N.C. Gen. Stat. § 126-34.02, an applicant for State employment may file a contested case petition under Article 3, Chapter 126, if the employee believes that he or she has been retaliated against in his or her application for employment or in the terms and conditions of the employee's employment.

6. N.C. Gen. Stat. § 126-84 states that:

(a) It is the policy of this State that State employees shall have a duty to report verbally or in writing to their supervisor, department head, or other appropriate authority, evidence of activity by a State agency or State employee constituting any of the following:

    (1) A violation of State or federal law, rule, or regulation.
    (2) Fraud.
    (3) Misappropriation of State resources.

(4) Substantial and specific danger to the public health and safety.
(5) Gross mismanagement, a gross waste of monies, or gross abuse of authority.

7. N.C. Gen. Stat. § 126-85(a) provides:

No head of any State department, agency or institution or other State employee exercising supervisory authority shall discharge, threaten or otherwise discriminate against a State employee regarding the State employee's compensation, terms, conditions, location, or privileges of employment . . . .

8. The Whistleblower Act requires plaintiffs to prove, by a preponderance of the evidence, the following three essential elements:

(1) the plaintiff engaged in a protected activity,
(2) the defendant took adverse action against the plaintiff in his or her employment, and
(3) there is a causal connection between the protected activity and the adverse action taken against the plaintiff.

*Newberne v. Dep't of Crime Control & Pub. Safety*, 359 N.C. 782, 788, 618 S.E.2d 201, 206 (2005).

### (1) Did Petitioner engage in protected activity?

9. It is undisputed that when Petitioner began working as the Interim Chief Executive Officer of the Central Prison Healthcare Facility, she uncovered multiple instances of gross mismanagement and waste of State monies. Specifically, she uncovered that:

a. Respondent was paying Pharmacists to do the work of Pharmacy Technicians.
b. Respondent was overpaying the contract dental surgeon.
c. Multiple financial issues from previous in-house audits had never been corrected.
d. Respondent was renting specialized hospital beds rather than buying them, which would save $250,000 per year.
e. Simple changes such as requiring employees to come to work on time saved countless hours of overtime pay; and
f. Requiring competitive bidding would reduce costs for the Respondent.

10. Petitioner reported these items to her supervisors and attempted to change the processes which led to this gross mismanagement and waste. At times, Petitioner was rebuffed by her supervisors.

**(2)     Did Respondent take adverse action against Petitioner in her employment?**

11.     Respondent took an adverse action against Petitioner by denying her a promotion that she applied for, but that Respondent offered to a non-State employee applicant.

**(3)     Is there a causal connection between the protected activity and the adverse action taken against the plaintiff?**

12.     Petitioner did not present any direct evidence of a retaliatory motive, and therefore, the undersigned must proceed under a pretext theory to establish the third element of her Whistleblower claim—the causal connection between the protected activity and the adverse action taken. *Newberne*, 359 N.C. at 790–92, 618 S.E.2d at 207–08; *Hodge v. North Carolina Dept. of Transp.*, 246 N.C. App. 455, 471, 784 S.E.2d 594, 605–06 (2016).

13.     Pretext cases "are governed by the burden-shifting proof scheme developed by the United States Supreme Court in [the] *McDonnell Douglas Corp. v. Green* and *Texas Department of Community Affairs v. Burdine* cases. *Id*. Under the *McDonnell Douglas/Burdine* proof scheme, once a plaintiff establishes a *prima facie* case of unlawful retaliation, the burden shifts to the defendant to articulate a lawful reason for the employment action at issue. If the defendant meets this burden of production, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered explanation is pretextual. The ultimate burden of persuasion rests at all times with the plaintiff. *Newberne*, 359 N.C. at 791, 618 S.E.2d at 207–08.

14.     To raise a factual issue regarding pretext, the "evidence must go beyond that which was necessary to make a *prima facie* showing by pointing to specific, non-speculative facts which discredit the defendant's non-retaliatory motive." *Manickavasagar v. N.C. Dep't of Pub. Safety*, 238 N.C. App. 418, 430 767 S.E.2d 652, 659 (2014).

15.     "The ultimate question is whether the employer intentionally [retaliated], and proof that the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that [plaintiff's] proffered reason . . . is correct. It is not enough to disbelieve the defendants." *Miller v. Barber-Scotia College*, 167 N.C. App. 165, 168, 605 S.E.2d 474, 477 (2004).

16.     If the employer articulates a legitimate, nondiscriminatory reason for its action, Petitioner "must forecast evidence from which a reasonable finder of fact could determine that the defendant's proffered reason for [hiring another candidate] was pretextual and that the plaintiff's [whistleblowing] was the true motivating force behind the [] decision or risk having [her] complaint dismissed." *Walls v. City of Winston-Salem*, 211 N.C. App. 199, 711 S.E.2d 875 (2011). Here, Petitioner does neither.

17. In this case, even if Petitioner is able to establish a *prima facie* case of unlawful retaliation for identifying gross mismanagement within Respondent, she cannot establish that the Department's lawful reason for choosing another candidate was pretextual.

18. Respondent presented a legitimate nondiscriminatory reason for selecting Chad Lovett for the CEO position. As set forth above, Respondent chose Mr. Lovett because he was substantially more qualified than Petitioner, had extensive years of hospital CEO experience, and provided superior interview responses to the panel's interview questions. Petitioner lacked the extensive hospital CEO experience that the Department was seeking. Rather, Petitioner, with the exception of two years, had no experience with hospital administration but worked as a pharmacist and had six years as a pharmacy director. Petitioner was significantly less experienced as a CEO than Chad Lovett.

19. Petitioner failed to present sufficient, credible evidence to prove that the interview panel's selection of Chad Lovett, and Judge Young's determination that Chad Lovett was more qualified, was pretextual. That is, Petitioner failed to present credible evidence that the true motivation of the interview panel and Judge Young in hiring Chad Lovett was in retaliation for Petitioner's whistleblowing activities. *See, e.g.*, *Miller*, 167 N.C. App. 168, 605 S.E.2d 477 ("A plaintiff's own assertions of discrimination are insufficient to overcome an employer's legitimate, nondiscriminatory reason for discharge."); *DeJarnette v. Corning*, 133 F.3d 293, 299 (4th Cir. 1998) (noting in citation that an "employee must present evidence reasonably calling into question the honesty of his employer's belief; employee's mere demonstration that his employer's belief may be incorrect is not sufficient to prove discrimination").

20. Given that Petitioner was selected as the most qualified candidate during the first two interviews, but not even rated in the top three choices by the third interview panel, Petitioner's evidence created some inference of retaliation by Respondent in selecting Chad Lovette, instead of Petitioner, for the CEO position. However, the preponderance of Petitioner's evidence was based upon her own inferences and unsupported speculation. No other witnesses testified at the hearing in support of Petitioner's speculative opinions. While Petitioner attempted to meet her burden with conclusory allegations, she did not establish that Respondent's stated reason for choosing another candidate for the CEO position, and not Petitioner, was false or a pretext for illegal retaliation based on Petitioner's earlier reports of gross mismanagement. *See Fatta v. M & M Properties Management, Inc.*, 221 N.C. App. 369, 727 S.E.2d 595 (2012).

21. Based upon the foregoing Findings of Fact and Conclusion of Law, Petitioner failed to prove by a preponderance of the evidence that Respondent retaliated against her, in violation of the Whistleblower Act, N.C. Gen. Stat. §§ 126-84, 126-85, and N.C. Gen. Stat. § 126-34.02(b) by selecting another applicant for the Hospital Chief Executive Officer Position and thereby denying Petitioner a promotion to that position.

## FINAL DECISION

Based upon the foregoing Findings of Fact and Conclusions of Law, the undersigned determines that Respondent did not retaliate against Petitioner, in violation of N.C. Gen. Stat. §§ 126-34.02(b), 126-84, and 126-85, by selecting another applicant for the Hospital Chief Executive Officer Position and denying Petitioner a promotion to that position.

## NOTICE OF APPEAL

This Final Decision is issued under the authority of N.C.G.S. § 150B-34. Pursuant to N.C.G.S. § 126-34.02, any party wishing to appeal the Final Decision of the Administrative Law Judge may commence such appeal by filing a Notice of Appeal with the North Carolina Court of Appeals as provided in N.C.G.S. § 7A-29(a). The appeal shall be taken within 30 days of receipt of the written notice of final decision. A notice of appeal shall be filed with the Office of Administrative Hearings and served on all parties to the contested case hearing.

This the 25th day of February, 2021.

*[Signature: Melissa Owens Lassiter]*

Melissa Owens Lassiter
Administrative Law Judge

## **CERTIFICATE OF SERVICE**

The undersigned certifies that, on the date shown below, the Office of Administrative Hearings sent the foregoing document to the persons named below at the addresses shown below, by electronic service as defined in 26 NCAC 03 .0501(4), or by placing a copy thereof, enclosed in a wrapper addressed to the person to be served, into the custody of the North Carolina Mail Service Center who subsequently will place the foregoing document into an official depository of the United States Postal Service:

Jennifer J Knox
The Law Firm of Jennifer Knox, PC
jenknox74@gmail.com
    Attorney For Petitioner

Tammera S Hill
Assistant Attorney General, NC Department of Justice
thill@ncdoj.gov
    Attorney For Respondent

Norlan Graves
North Carolina Department of Justice
ngraves@ncdoj.gov
    Attorney For Respondent

This the 25th day of February, 2021.

*/s/ Jerrod Godwin*

Jerrod Godwin
Administrative Law Judge Assistant
N.C. Office of Administrative Hearings
1711 New Hope Church Road
Raleigh, NC 27609-6285
Phone: 919-431-3000